IN THE COURT OF CRIMINAL APPEALS

OF TEXAS





NO. AP-74,713






DANNY PAUL BIBLE, Appellant


v.


THE STATE OF TEXAS





ON DIRECT APPEAL

FROM CAUSE NO. 947117 IN THE 351ST DISTRICT COURT 

HARRIS COUNTY





 Keller, P.J., delivered the opinion of the Court in which MEYERS,
WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. 
PRICE, J., concurred in the result.


O P I N I O N




 Appellant was convicted in June 2003 of a capital murder (1) committed in May 1979. 
Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure, 
Articles 37.0711 §§3(b) and 3(e), the trial judge sentenced appellant to death. (2) Direct appeal to this
Court is automatic. (3) Appellant raises fourteen points of error and two supplemental points of error. 
We shall affirm.

I. CONFESSION


A. Admissibility


1. The parties' contentions


 In points of error one through four, argued together, appellant contends that four tape-recorded statements obtained in Louisiana were admitted into evidence in violation of Article 38.22. (4) 
Specifically, he contends that Louisiana law enforcement officers failed to give some of the warnings
required by the statute. Appellant contends that the warnings were deficient because they specified
that his statements could be used against him in "court" but did not specify that the statements could
be used against him at "trial." (5) During oral argument, defense counsel also contended that, while
the Louisiana warnings explained the accused's right to have counsel present during questioning,
they did not explain that the defendant also had a right to consult an attorney "prior to" questioning. (6) 
Appellant further argues that the set of warnings given in connection with one of the recorded
statements (State's Exhibit 4) was even more deficient, omitting several other warnings required by
the statute. 

 Relying upon Davidson v. State, (7) appellant argues that Texas law applies to these statements
taken in Louisiana and, therefore, they should have been excluded. Appellant points out that,
although the Legislature amended the law to supercede Davidson, (8) the amendment applied only to
statements taken after September 1, 2001, and therefore, does not apply to the present case. (9)

 In two supplemental points of error, appellant contends that State's Exhibit 4 was also
inadmissible under Louisiana law because the recording for that statement did not contain all the
warnings required by Miranda v. Arizona. (10) 

 Although appellant states early in his discussion that "[t]hese tape recorded statements
constituted the most incriminating evidence at the guilt phase of trial and at the punishment phase,"
he presents a harm analysis with regard to only three of the four statements, omitting any discussion
of harm as to the recorded confession to the primary offense. Appellant concludes the discussion
of both his original and his supplemental points with a request to remand the case for a new
punishment hearing. (11)

 The State argues that the warnings given in Louisiana were the "fully effective equivalent" (12)
of the warnings required by Article 38.22. The State contends in the alternative that the admissibility
of the recorded statements should be governed by Louisiana law and that Davidson should not be
applied to circumstances of the present case.

2. Background


 On May 27, 1979, the partially clad body of Inez Deaton was discovered in a field in
Houston. She had been sexually assaulted and murdered. The case remained unsolved until
December 18, 1998, when appellant confessed to a detective in Louisiana that he had committed this
offense. The circumstance that led to appellant's confession was his arrest in West Baton Rouge
Parish in Louisiana for an aggravated rape. (13) On December 16, 1998, Detective Randall Walker, of
the West Baton Rouge Parish Sheriff's Office, questioned appellant about the Louisiana offense. 
Appellant gave a tape-recorded statement confessing to that offense (State's Exhibit 2). (14) 

 The next two tape-recorded statements were obtained on December 18, pursuant to
questioning by Detective Walker and Louisiana Trooper Joe Whitmore. Both officers were present
during interrogation throughout the day, but Detective Walker conducted the questioning in the
morning and during the first tape-recorded session while Trooper Whitmore asked questions during
the second tape-recorded session. The morning (unrecorded) session of the interview began at 9:50
a.m. The first tape-recorded session began at 1:40 p.m. and resulted in a tape-recorded confession
to the present offense, the aggravated rape and murder of Deaton (State's Exhibit 3A). (15) The second
tape-recorded session began sometime in the afternoon, probably no later than 4:10 p.m. and perhaps
earlier, (16) and resulted in a tape-recorded confession to the murders of three people in Palo Pinto
County (State's Exhibit 4). The last tape-recorded statement that is the subject of appellant's
complaints was made on January 6, 1999, and contained confessions to numerous aggravated sexual
assault offenses against appellant's five young nieces in San Jacinto County (State's Exhibit 5). 

 Before each of the interviews during which the tape-recorded statements were obtained, the
following form from the West Baton Rouge County Sheriff's office was read to appellant: (17)

Warning:

Before you can be questioned concerning the alleged offense(s), you must understand
and waive your constitutional rights. If you do not understand them, or do not waive
them, you cannot be asked any questions concerning the offense(s).


1. You have the right to remain silent.


2. If you give up the right to remain silent:


 A) Anything you say can and will be used against you in court.


 B) You have the right to get advice from a lawyer and to have a lawyer with 

 you during your interview.


 C) If you want a lawyer and cannot afford one, the court will appoint one to

 assist you without charge.


 D) If you decide to answer questions now, without consulting with a lawyer

 and without having one present, you may stop the interview at any time.


3. You have the right to face your accuser(s) in court.


Consent to speak:

I have read this statement of my rights, or had it read to me, and I understand what
it says. I am willing to answer questions now without talking to a lawyer first, and
without having one present. No promises have been made to me, and no threats have
been made against me.


Each day that appellant participated in an interview, he signed a copy of this form after it was read
to him for the first time that day. (18) Some days, he signed a separate copy for multiple interviews,
but only one copy was signed on December 18.

 The warnings on the form also appear verbatim on the recordings in State's Exhibits 2, 3A,
and 5. (19) On the recordings, after each individual warning (right to remain silent, used against you,
right to a lawyer, etc.), appellant was asked if he understood the particular warning, and he replied
affirmatively. (20) Appellant also was asked during each recording whether the waiver (consent to
speak) paragraph was accurate, and appellant replied that it was.

 State's Exhibit 4 does not contain these warnings verbatim. Instead, the recording contains

a reminder from Trooper Whitmore that appellant had been given the West Baton Rouge County
Sheriff's form and that this form basically advised appellant of his constitutional rights. Trooper
Whitmore then reminded appellant that he had read the form, had said that he understood it and had
signed it, that Whitmore and Walker had witnessed those actions, and that "basically, what it [the
form] says is that you're voluntarily talking to us, is that correct?" Appellant replied affirmatively. 
Trooper Whitmore then stated that he was "not going to go through the entire form." Instead he
asked, "Do you still agree to voluntarily talk to us?" Again, appellant replied affirmatively. Trooper
Whitmore then gave the following warnings in question format, to each of which appellant replied
affirmatively: 

And you do understand that you don't have to talk to us?


And you do understand that in the course of talking to us if you decide to stop talking
to us at any time that you have the right to do that?


You also understand that you have the right to have an attorney present here while
we're talking to you?


At the conclusion of those warning questions and appellant's responses, Trooper Whitmore asked, 
"And you've agreed to continue to talk to us, voluntarily, of your own free will?" Again, appellant
answered in the affirmative.

 In its findings of fact and conclusions of law, the trial court found that appellant was in
custody, that he was read Miranda warnings each and every time officers took a taped statement
from him, that appellant freely and voluntarily waived his constitutional rights on each of those
occasions, and that no threats or promises were made to appellant in exchange for his statements.

3. Analysis


 We need not address the parties' arguments regarding the choice-of-law issue because we
find that the recorded statements are admissible under Article 38.22. Davidson itself recognized that
Article 38.22 contained exceptions to its requirement of strict compliance for oral statements but
simply noted that the exceptions were not applicable in that case. (21) Under Section 3(e)(2) of the
statute, it is sufficient that "the accused was given the warning in Subsection (a) of Section 2 above
or its fully effective equivalent." (22) Therefore, if the warnings given by the Louisiana officers are the
"fully effective equivalent" of the warnings outlined in Article 38.22, §2, then Article 38.22 does not
bar admission of the statements. 

 We addressed the "court" versus "trial" complaint under a previous version of the statute in
Bennett v. State. (23) That case involved a Louisiana "used against you" warning almost identical to
the one at issue here. (24) Concluding that use of the term "court" instead of "trial" "does not dilute the
meaning or import of the warning," we upheld the admission of the evidence. (25) The version of the
statute in effect at the time did not contain subsection (e)'s strict compliance language or subsection
(e)(2)'s "fully effective equivalent" exception. (26) Nevertheless, by saying that the use of "court"
instead of "trial" did not "dilute the meaning or import of the warning," we clearly expressed the
view that the Louisiana warning was in fact the fully effective equivalent of the one contained in the
statute. Although appellant contends that the equivalence of the warnings is negated by the fact that
Article 38.22 contains two "used against" warnings, one specifying "court" and the other specifying
"trial," that language was also present in the statute at the time Bennett was decided. (27) The two
warnings here appear to largely overlap and, in fact, "court" is the broader term, and is reasonably
understood to include the term "trial."

 Moreover, we find that the warnings contained in State's Exhibits 2, 3A, and 5 also fairly
convey the concept that the accused is entitled to consult counsel "prior to" interrogation. The
warning says, "You have the right to get advice from a lawyer and to have a lawyer with you during
your interview." The wording of the warning suggests that the accused is entitled to a lawyer's
advice outside of the time during the interview. And the waiver of rights admonition that follows,
by specifying that the accused is "willing to answer questions now without talking to a lawyer first,
and without having one present," makes clear that this right to an attorney can be exercised before
interrogation. 

 That leaves State's Exhibit 4, which, if looked at in isolation, would appear to lack some of
the warnings required, not only by Article 38.22, but also by Miranda itself. State's Exhibit 4 does
not contain a "used against" warning, does not contain the language making clear that counsel can
be consulted before interrogation, and does not contain the admonition that an attorney can be
appointed if the accused cannot afford one. But we disagree with the proposition that State's Exhibit
4 should be looked at in isolation.

 The First Court of Appeals faced a similar situation in Franks v. State. (28) In that case, a tape-recorded interrogation first commenced at 11:53 a.m. and continued until 12:30 p.m. (29) Warnings
were given at the beginning of this interrogation. (30) The police officers then interrupted their
interrogation and talked to other witnesses. (31) Interrogation resumed that same day at 4:02 p.m. and
continued until 4:23 p.m. (32) This latter interrogation was also tape-recorded, but the warnings were
not given. (33) However, the defendant was reminded that he had been advised earlier of his
constitutional rights, and the defendant acknowledged that he had been so warned. (34) The court of
appeals held that "the second phase of the interrogation was merely a continuation of the
interrogation process, and that under the circumstances presented, there was not such a 'break' in
the interrogation proceeding as to require the giving of new warnings." (35)

 Although this Court has not addressed a similar situation with regard to an Article 38.22
claim, we have addressed a somewhat similar fact situation in the Miranda context. In Bagley v.
State, (36) the defendant was given all the required Miranda warnings before signing a written
confession. (37) The officer then returned the defendant to his jail cell and separately questioned the
co-defendant. (38) Six to eight hours later, interrogation of the defendant resumed, resulting in another
confession. (39) Although appellant was given oral warnings before this second confession, he
contended on appeal that the oral warnings did not sufficiently comply with Miranda. (40) Although
we held that the oral warnings did in fact comply with Miranda, we also found that the warning
given six to eight hours earlier was sufficient to satisfy Miranda's requirements. (41)

 More recently, in Jones v. State, (42) we addressed whether warnings given two days before the
complained-of statement were sufficient to satisfy Miranda. (43) Finding that the earlier warnings were
not effective, we distinguished Bagley and some out-of-state cases on several grounds: (1) the
passage of time, (2) the interrogation was conducted by a different person, (3) the interrogation
related to a different offense, and (4) the officer never asked the defendant if he had received any
earlier warnings, whether he remembered those warnings, and whether he wished to waive or invoke
them. (44) 

 In the present case, the session that produced State's Exhibit 4 began less than three hours
after the beginning of the session that produced State's Exhibit 3A. Although different officers
conducted questioning during each session and each session focused on a different set of crimes, the
same officers were present during both sessions. Trooper Whitmore reminded appellant of his
earlier waiver of rights; secured his acknowledgment that he had been previously been given
warnings; briefly reminded him of his right to silence, to terminate the interview, and to counsel; and
secured his assent to continue the interview. Under these circumstances, we find that the two
sessions were part of a single interview for the purpose of Article 38.22 and Miranda. But even if
they were not considered part of the same interview, we would find that Trooper Whitmore's
conduct under the circumstances was sufficient to constitute the administration of a "fully effective
equivalent" to the required warnings and was sufficient to satisfy Miranda. Points of error one
through four and appellant's supplemental points of error are overruled. 

B. Jury Instruction


 In point of error five, appellant complains about the trial court's refusal to submit a jury
instruction concerning the voluntariness of appellant's tape-recorded confession to the primary
offense given to Texas law enforcement officers (State's Exhibit 1). Appellant contends that the
following testimony from Harris County Detective Roger Wedgeworth raised the issue of whether
there was an "implied promise and/or expectation" that appellant would receive only a life sentence
rather than the death penalty:

[Direct Examination]


Q. At this point right now tell the jury what it was you said to Danny Bible in
regards to this conversation.


A. Well, I told him that I understood what he what [sic] was trying to do. By
confessing to us I understood that he was agreeing to come to Texas to
confess to this murder, to plea out for a life sentence. He wanted to do his
time here in Texas because that's where his family is. His mother and dad I
think is the reason that he gave, as to wanting to come back to Texas.


Q. So, you gave that explanation in the beginning to the defendant?


A. Yes, I did. 


Q. Did you make any explanations or try to clear that up with the defendant
before you began your interviewing, the details of this murder?


A. Yes, I did. 


Q. Tell the jury what you told him?


A. Well, he was 47 years old at the time we talked and I understood that any
lengthy prison sentence would be a life sentence for him. He'd spend the rest
of his life in jail.


Q. Did you tell him that?


A. I did tell him that, yes.


Q. What else did you tell him?


A. Well, that I understood, you know, what he wanted to do.


Q. And as far as understanding of what it was he wanted, what did you say to
him by way of explanation as to whether or not you could make that happen?


A. Oh, I see. We - I explained to him that I couldn't make any kind of deal for
him at all. That any deal that was made would have to go through the
district attorney's office.


* * *



[Cross-Examination]


Q. And what you concluded after talking to Detective Walker, and even before
you talked to the defendant, was he was trying to get out of Louisiana and go
to Texas to serve time and he would serve it on this case; right?


A. That's - that's what his goal was, yes, sir.


Q. He would plead for a life sentence on this case?


A. Yes, sir.


Q. And what you told him was, that based on his age any sentence he got would
be a life sentence?


A. Yes, sir, that is correct.


Q. Now, you didn't mean for that to sound like that you were promising him that
any sentence he got would be a life sentence, you were referring to his age;
right?


A. That's correct.


Q. But what you told him was, any sentence you get will be a life sentence for
you?


A. Well, that - I mean, that's - I told him that, that is true.


Q. Did any discussion about the death penalty come up while you were
questioning him?


A. No.


[Discussion with judge omitted].


Q. Did you tell him, tell the defendant, that in order for him to get to Texas and
serve a sentence, he was going to have to confess for the DA to be able to
take the charges in the case?


A. Well, I told him that I wasn't the one that could make any kind of decision,
period. And that it was entirely up to the DA. That's what I told him.


Q. You didn't tell him anything about he had to confess?


A. I never told him that he had to confess.


Q. Or give a statement? I thought you testified previously that what you told
him was that he was going to have to tell you-all first whatever it was he had
to tell you?


A. Well, I know exactly what I said back then and that is what I said. But the
fact is, whenever we first met with him, we asked him if he would talk with
us and he said he would and all that. And I told him that everything would
have to go to the district attorney's office; but, in order for us to show them
anything we had to have something from him. That's basically what I said
back then.


Q. Okay. So, you knew he wanted a life sentence. You told him that whatever
he got was going to amount to a life sentence for him and for him to get that
he was going to have to tell you, he was going to have to talk to you.


A. Well, I told him I knew what he wanted to do. I knew he wanted to go to
Texas to be with family, because it is a lot easier to do time with family
around. But yes, I told him that.


Q. And the reason I am asking that is none of us can read the defendant's mind. 
We don't know how he actually interpreted what you said. We understand
what you meant by what you said, but at issue is what he understood. And
you admit that he was making it really clear to you that he wanted to confess
because he wanted to go serve his time in Texas?


A. I understood that that's, in fact, what he wanted to do.


(Emphasis added).

 Appellant does not say whether he is relying upon federal or state law, but he cites a
discussion in Mendoza v. State (45) that refers to Article 38.21. When evidence from any source raises
an issue regarding involuntariness under Article 38.21 and the defendant requests an instruction,
Article 38.23 requires that an appropriately worded instruction on the issue be submitted to the jury. (46) 
This Court has held that a promise can render a confession invalid under Article 38.21 if it is
"positive, made or sanctioned by someone in authority, and of such an influential nature that it would
cause a defendant to speak untruthfully." (47) But when the accused acts as an entrepreneur in
attempting to negotiate a deal, we will not find implied promises "in official responses [to the
accused's overtures] that are ambiguous at best." (48) And we will not find that a promise was "made
or sanctioned by someone in authority" when the officer conducting the interview makes clear that
he has no authority to make deals. (49)

 Here, appellant acted as an entrepreneur in attempting to secure a deal for a life sentence in
Texas. Although the evidence shows that Detective Wedgeworth did indicate that, because of
appellant's age, any prison sentence would result in incarceration for the rest of appellant's life, there
is no evidence of any promise from Wedgeworth that appellant would receive a life sentence instead
of the death penalty. And it is undisputed that Detective Wedgeworth clearly explained that he had
no authority to make any deals. Point of error five is overruled.

II. PUNISHMENT COMPLAINTS


A. Legal Sufficiency - Future Dangerousness


 In point of error fourteen, appellant contends that the evidence is legally insufficient to
support the jury's answer to the "future dangerousness" special issue. (50) Specifically, appellant
contends that, because he had previously been given a life without parole sentence in Louisiana, the
only society he would ever interact with would be prison society. He further argues that the evidence
shows he is not a threat to prison society because he had only two minor, nonviolent disciplinary
infractions during the twelve years he was incarcerated in Texas on another conviction and the State
presented no evidence of any disciplinary infractions during his incarceration in Louisiana.

 Good behavior in prison does not preclude a finding of future dangerousness. (51) All that is
required is that the evidence be sufficient for a rational trier of fact to conclude beyond a reasonable
doubt that there is a probability that the defendant would commit criminal acts of violence that
would constitute a continuing threat to society. (52) The record of this case is littered with such
evidence, specifically, evidence of appellant's numerous violent offenses. After raping and killing
Deaton, appellant fled to Montana and Wyoming, where he developed an abusive relationship with
a woman, who finally left appellant because of the constant violence directed toward her. Appellant
ground his knee into her ear, punched her in the face so hard that she was required to get stitches,
poured gasoline onto her vehicle and set it on fire, and attacked her vehicle with an axe while a three-year-old child was inside.

 After that relationship ended, appellant went to Weatherford, where he murdered his sister-in-law Tracy Powers, her infant son Justin Powers, and Tracy's roommate Pam Hudgins. He then
fled back to Montana, where he kidnapped a young woman and an eleven-year-old girl, and he raped
the girl. On August 3, 1984, appellant pled guilty to the Pam Hudgins's murder and was sentenced
to twenty-five years in prison. He also pled guilty to two aggravated kidnappings he committed in
Montana. He was later placed on parole, and he moved to Texas, where he sexually assaulted his
five nieces (children of various ages) numerous times.

 Finally, on November 7, 1998, while in Louisiana, appellant compelled Tera Robinson to
submit to a sexual assault under threat of death. After the sexual assault, appellant tied Robinson
up. She told appellant that her boyfriend was coming home soon and that appellant needed to leave. 
Before leaving the scene, he tried without success to stuff Robinson into a duffel bag.

 Appellant has killed four people, including an infant. He has sexually assaulted numerous
others and might have killed his latest victim if he had succeeded in stuffing her into a duffel bag. 
There was ample evidence from which a rational jury could conclude that appellant posed a future
danger to society, whether inside or outside prison. Point of error fourteen is overruled.

B. Extraneous offenses 


 In points of error six and seven, appellant contends that the portions of his January 6th
confession relating to the sexual assault of two of his nieces were improperly admitted because the
State failed to present any corroborating evidence that those offenses occurred. He argues that the
corpus delicti doctrine requires some evidence independent of the defendant's confession that these
two nieces were in fact sexually assaulted. To put appellant's claim in perspective, we observe that
appellant confessed to sexually molesting and assaulting five nieces. The oldest was K.B., three of
the others were her sisters, and one was a cousin. K.B. testified at trial to numerous instances of
appellant sexually assaulting her, one of her sisters (S.B., the next oldest), and a cousin, but she had
not observed appellant sexually assaulting her two youngest sisters. The only evidence of sexual
misconduct with the two youngest sisters came from appellant's confession.

 The corpus delicti doctrine requires that evidence independent of a defendant's extrajudicial
confession show that the "essential nature" of the charged crime was committed by someone. (53) The
doctrine was designed to prevent "errors in convictions based upon untrue confessions alone" and
"guarded against the shocking spectacle and deleterious effect upon the criminal justice system when
a murder victim suddenly reappeared, hale and hearty, after his self-confessed murderer had been
tried and executed." (54) Appellant argues that the corpus delicti doctrine should be expanded beyond
the charged offense to extraneous offenses offered at the punishment phase of trial. He
acknowledges that there are courts of appeals decisions contrary to his position (55) but contends that
their pronouncements conflict with the history and purpose of the corpus delicti rule. 

 We have declined to apply corroboration requirements to extraneous offenses offered at the
punishment stage of a capital case in a similar context - the accomplice witness rule. (56) We reasoned
that the accomplice witness rule is concerned with the sufficiency of the evidence to support the
conviction rather than the admissibility of evidence at the punishment stage of trial. (57) We explained
that even uncorroborated accomplice testimony about the defendant's extraneous bad acts constitutes
"relevant information about a defendant" within the scope of Article 37.071. (58)

 We agree with the Waco Court of Appeals that the corpus delicti rule is similar in purpose
to the accomplice witness rule. (59) As we have already observed, the corpus delicti doctrine is
concerned with preventing a conviction from being based solely upon a false confession. When the
offense at issue is extraneous, offered at the punishment stage, no concern about the defendant's
conviction arises. We are not faced with the specter of a totally innocent defendant being convicted
for a crime that never occurred solely on the basis of a confession resulting from official coercion
or the defendant's own delusions. Consequently, we hold that the corpus delicti doctrine does not
apply to extraneous offenses offered at the punishment phase of a capital murder trial. Points of
error six and seven are overruled.

C. Jury Charge 


 In point of error ten, appellant complains about the trial court's refusal to submit in the jury
charge a definition of the word "deliberately." We have previously resolved this issue adversely to
appellant's position. (60) Point of error ten is overruled.

D. Argument


1. "Intentionally"


 In point of error eleven, appellant contends that the prosecutor gave an erroneous definition
of "intentionally" in closing argument at the punishment stage of trial. Appellant quotes the
following portion of the record in his brief:

[PROSECUTOR]: And so, we have these issues up here for you to have to deal with. 
And what's the first one? Do you find from the evidence beyond a reasonable doubt
that the conduct of the defendant that caused the death of the deceased was
committed deliberately and with a reasonable expectation that the death of the
deceased or another would result? Deliberately, you have heard it defined for you
somewhat. You know that it doesn't mean what you found him guilty of when you
said he acted intentionally, because intentionally means (snaps finger) it happened
that fast. He decided in that split second to commit that capital murder.


[DEFENSE COUNSEL]: Your Honor, I object. That is a misstatement. 
Intentionally doesn't mean that it happened that fast. It means conscious objective
or desire.


[THE COURT]: Overruled.


[PROSECUTOR]: So, it doesn't mean intentionally. That's true. It also does not
mean premeditated, planning, long, drawn-out process like [defense counsel] would
have you think it means. Whatever you want it to mean is completely up to you.


 It is difficult to see how the prosecutor's misdefining the term "intentionally" in the
punishment phase could have any adverse effect on the defendant since that term was used only at
guilt, and the jury had already found him guilty. Appellant's real argument appears to be that the
prosecutor misdefined the term "deliberately," as revealed by the following sentence in his brief: "In
the instant case, the prosecutor urged the jury to define deliberately in a way that makes a deliberate
act substantially less than an intentional act." But appellant did not object to the prosecutor's
comments regarding the term "deliberately," nor did he complain to the trial court that the
prosecutor's comments regarding the term "intentionally" had in any manner diluted the meaning
of "deliberately." Consequently, appellant failed to preserve error. (61) Moreover, even if error had
been preserved, the comment appears to suggest that "deliberately" means more, not less, than
"intentionally." Point of error eleven is overruled.

2. "Deserved to die"


 In point of error twelve, appellant contends that the prosecutor engaged in improper argument
when she said that appellant "deserved to die." He asserts that the prosecutor's argument was a
blatant appeal to emotions rather than an argument based on the special issues and violated the law
that prohibits the jury from answering the special issues based upon "mere sentiment, conjecture,
sympathy, passion, prejudice, public opinion, or public feeling." (62) The following passage in the
record is relevant to appellant's claim:

[PROSECUTOR]: Finally, you are on this jury because you believe that there are
crimes that have been committed and defendants who exist that deserve the death
penalty. Because you appreciate the fact that there is [sic] some people born you just
can't do anything else with. And God only knows why they turn out the way they do
or what made them the way they are. None of us are ever going to understand that. 
But because there are people like that, that's why we had [sic] the death penalty. And
for those kinds of people to deal with those sorts of people our law has crafted these
issues to address when it is appropriate and when it is not. The questions are
designed to try and make it all a process that we can all deal with. And when you
answer these questions you answer them because you know in your heart that some
people deserve the death penalty.


[DEFENSE COUNSEL]: Your Honor, she is appealing to them to answer the
questions based on what they think is deserved, not on the basis of those questions.


[THE COURT]: Overruled.


[PROSECUTOR]: No, I am not. I am telling you to keep in mind that we have the
death penalty for reasons that you-all understand. And if you ask yourself the
question. Why do we have the death penalty? And you ask yourself which deserve
it and which don't, do you think anybody deserves it less - 


[DEFENSE COUNSEL]: Objection, again, to the argument. They are trying to
decide what he deserves rather than answering these three questions.


[THE COURT]: Overruled.


[PROSECUTOR]: - than Danny Bible? How many people do you have to murder
to be a future threat to deserve the death penalty? One, two, three, four? How many
children do you have to rape to deserve the death penalty, to be a threat? How many
women do you have to rape to deserve the death penalty, to be a future threat? How
many babies do you have to kill? Danny Bible's done all those things. There can be
no doubt in your mind that the answers to those questions are yes and yes and no,
because there is only one place where he belongs. He has left you with no other
choice. Sentence him to death.


 Article 37.0711 expressly permits the parties to argue "for or against sentence of death." (63) 
The prosecutor here did not make an argument based solely on emotion; she related her comments
specifically to the special issues. Point of error twelve is overruled.

3. Burden of proof 


 In point of error thirteen, appellant contends that the prosecutor made a comment in opening (64)
argument that improperly shifted the burden of proof on the future dangerousness special issue. The
record shows the following:

[PROSECUTOR]: You may hear from the Defense, He was good when he was in
the penitentiary. Well, let me tell you something. You don't find anything but one
year's worth of information that he didn't do anything wrong, that year from '83 to
'84, when he was in the penitentiary. I defy you to find a shred of documents
anywhere in evidence that says he is a model prisoner. You won't find it.


[DEFENSE COUNSEL]: Objection. Your Honor, that argument shifts the burden
on the Defense. It is not up to us to prove that he was a good, model prisoner and I
object to it.


[THE COURT]: Overruled.


 In O'Bryan v. State, we observed, "It is well-settled that the prosecutor, in argument, may
comment on the defendant's failure to call certain witnesses." (65) We held that this practice did not
constitute a shifting of the burden of proof on the special issues. (66) The failure to produce
documentary evidence is analytically similar. And in fact, later cases addressing constitutional self-incrimination claims have held that prosecutorial comment on the absence of evidence is proper so
long as "the language can reasonably be construed to refer to appellant's failure to produce evidence
other than his own testimony." (67) We conclude that the prosecutor's reference to the absence of
documentary evidence did not constitute a shifting of the burden of proof on the special issues. Point
of error thirteen is overruled.

E. Constitutionality of Death Penalty Scheme


1. Absence of meaningful appellate review


 In point of error nine, appellant contends that the current death penalty scheme is
unconstitutional because there is no meaningful appellate review of the special issues. He points out
that this Court refuses to conduct a factual sufficiency review of the future dangerousness special
issue and refuses to conduct a legal or factual sufficiency review of the mitigation special issue. 
Appellant concedes that we have previously decided these claims adversely to his position. (68) 
Nothing in his argument persuades us to retreat from our prior holdings. Point of error nine is
overruled.

2. Substance used in executions


 In point of error eight, appellant contends that pancuronium bromide, one of the substances
used in Texas executions, inflicts cruel and unusual punishment in violation of the Eighth
Amendment to the United States Constitution. The State argues that appellant failed to preserve
error because he did not object at trial.

 Assuming, arguendo, that appellant was not required to object at trial to preserve error on
this type of claim, we nevertheless conclude that we cannot address this claim in its current posture
in this appeal. This claim involves the same concerns that are involved in determining the reliability
of a scientific theory or technique. (69) This is the type of claim the resolution of which should provide
a rule of law for all cases, but a reliable resolution of the merits requires a fact-intensive inquiry. (70) 
Because of the absence of litigation during the trial, the record is not sufficiently developed to
resolve this claim, and the novel nature of the claim counsels against resolution through judicial
notice without the benefit of litigation before a fact-finder. (71) Point of error eight is overruled.

 The judgment of the trial court is affirmed.

 Keller, Presiding Judge

Date delivered: May 4, 2005

Publish
1. Tex. Penal Code §19.03(a).
2. Art. 37.0711 §3(g). Unless otherwise indicated all future references to Articles refer to
the Texas Code of Criminal Procedure.
3. Art. 37.0711 §3(j).
4. Appellant advanced these complaints to the trial court in a motion to suppress. A
pretrial hearing was held, after which the trial court denied the motion.
5. See Art. 38.22, §2(a)(1)("trial") and (2)("court").
6. See Art. 38.22, §2(a)(3).
7. 25 S.W.3d 183 (Tex. Crim. App. 2000).
8. See Art. 38.22, §8.
9. See Acts 2001, 77th Leg., ch. 990, §2.
10. 384 U.S. 436 (1966). Although appellant did not timely file these supplemental points
of error, we will consider them in the interest of justice.
11. Three of the tape-recorded statements (State's Exhibits 2, 4, and 5) were admitted only
at the punishment stage of trial.
12. See Art. 38.22, §3(e)(2).
13. Appellant was arrested in Florida but was subsequently extradited to Louisiana and
transported to the West Baton Rouge Parish Sheriff's office.
14. Appellant pleaded guilty to this offense on February 2, 1999.
15. Appellant later made another tape-recorded confession to this offense to Texas police
detectives - introduced at trial as State's Exhibit 1. Appellant does not contest the admissibility
of this subsequently recorded confession.
16. The record does not establish the exact time in the afternoon that the second tape-recorded session began, but the record does establish that the session began before appellant was
taken to a magistrate, that the session lasted for approximately fifty minutes, and that appellant
was taken before a magistrate at approximately 5:00 p.m.
17. In each instance, unrecorded oral conversations between appellant and the officers took
place after the warnings were given but before the tape-recorded statements. Appellant makes no
complaint regarding the unrecorded portions of the interviews. 
18. Appellant talked to law enforcement officials numerous other times and with the media
a couple of times while he was held in Louisiana. In connection with all the interviews in which
appellant participated, copies of this form were signed on December 16 (twice), 17, 18, 21, 23,
29, and 31; on January 3, 5 (twice), 6, 8, 11, 14, 16, 25, 28, and 29; on February 1, 3, 5, 9, 11, 18,
22, 23, and 26; March 1, 2, 3, 4, 10, 11, and 22; April 9, 19, and 22.
19. The entire form was read to appellant during the recording in State's Exhibits 2 and 5. 
State's Exhibit 3 included everything but the introductory paragraph.
20. During the recording in State's Exhibit 5, appellant twice stated in his own words that
he waived his right to a lawyer - the first time after acknowledging his understanding of warning
2B, and the second time after acknowledging his understanding of warning 2D.
21. 25 S.W.3d at 185 n.3.
22. Art. 38.22, §3(e)(2).
23. 742 S.W.2d 664 (Tex. Crim. App. 1987), vacated on other grounds, 486 U.S. 1051
(1988).
24. Id. at 676. The warning before us differs only in that it uses the phrase "can and will"
in place of the word "can." See id.
25. Id. at 677.
26. See Art. 38.22 (West 1988)(statute last revised in 1981).
27. Id.
28. 712 S.W.2d 858 (Tex. App.-Houston [1st Dist.] 1986, pet. ref'd).
29. Id. at 860.
30. Id. at 861.
31. Id. at 860.
32. Id.
33. Id.
34. Id. at 861.
35. Id.
36. 509 S.W.2d 332 (Tex. Crim. App. 1974).
37. Id. at 336.
38. Id. 
39. Id. at 337.
40. Id. at 334-335.
41. Id. at 337-338.
42. 119 S.W.3d 766 (Tex. Crim. App. 2003), cert. denied, 124 S. Ct. 2836 (2004).
43. See Jones, 119 S.W.3d at 795 (Keller, P.J. concurring).
44. Jones, 119 S.W.3d at 773 n. 13.
45. 88 S.W.3d 236 (Tex. Crim. App. 2002).
46. Id. at 239-240.
47. Martinez v. State, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004).
48. Masterson v. State, 155 S.W.3d 167, 171 ((Tex. Crim. App. 2005); Johnson v. State,
68 S.W.3d 644, 654-655 (Tex. Crim. App. 2002); Henderson v. State, 962 S.W.2d 544, 564
(Tex. Crim. App. 1997), cert. denied, 525 U.S. 978 (1998).
49. Henderson, 962 S.W.2d at 564-565.
50. The issue asks: "whether there is a probability that the defendant would commit
criminal acts of violence that would constitute a continuing threat to society." Art. 37.0711,
§3(b)(2).
51. Williams v. State, 937 S.W.2d 479, 483 (Tex. Crim. App. 1996); 
52. Blue v. State, 125 S.W.3d 491, 493 (Tex. Crim. App. 2003), cert. denied, 125 S. Ct.
297 (2004)(citing Jackson v. Virginia, 443 U.S. 307 (1979)).
53. Salazar v. State, 86 S.W.3d 640, 644-645 (Tex. Crim. App. 2002).
54. Id. at 644.
55. Padron v. State, 988 S.W.2d 344, 346 (Tex. App.-Houston [1st Dist.] 1999, no pet.);
Malpica v. State, 108 S.W.3d 374, 378 (Tex. App.-Tyler 2003, no pet.). To appellant's list we
add Jackson v. State, 65 S.W.3d 317, 321 (Tex. App.-Waco 2001, no pet.)("Arguably, the
corpus delicti rule has no application in the punishment phase for the same reasons the
accomplice witness rule does not apply," but concluding that, even if the rule did apply, there
was sufficient independent evidence in that case). 
56. Jones v. State, 982 S.W.2d 386, 395 (Tex. Crim. App. 1998), cert. denied, 528 U.S.
985 (1999); May v. State, 618 S.W.2d 333, 342-343 (Tex. Crim. App.), vacated on other
grounds, 454 U.S. 959 (1981) and overruled on other grounds, Ex parte Elizondo, 947 S.W.2d
202, 205 (1996). 
57. May, 618 S.W.2d at 342.
58. Id.
59. See Jackson, 65 S.W.3d at 321.
60. Chamberlain v. State, 998 S.W.2d 230, 237-238 (Tex. Crim. App. 1999), cert. denied,
528 U.S. 1082 (2000).
61. Tex. R. App. P. 33.1(a)(1)(A).
62. See Tong v. State, 25 S.W.3d 707, 712-713 (Tex. Crim. App. 2000), cert. denied, 532
U.S. 1053 (2001).
63. Art. 37.0711, §3(a)(1).
64. We refer to the prosecution argument preceding appellant's closing argument. 
Opening and closing arguments were delivered by different prosecutors in this case.
65. 591 S.W.2d 464, 479 (Tex. Crim. App. 1979), cert. denied, 446 U.S. 988 (1980). 
66. Id.
67. Patrick v. State, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995); see also Fuentes v.
State, 991 S.W.2d 267, (Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999).
68. Allen v. State, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003), cert. denied, 540 U.S.
1185 (2004)
69. See Hernandez v. State, 116 S.W.3d 26 (Tex. Crim. App. 2003).
70. Id.
71. Id.