**Opinion issued May 5, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-01082-CR

————————————

**PHILIP BATTLES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 248th District Court**
**Harris County, Texas**
**Trial Court Case No. 1532847**

---

## MEMORANDUM OPINION

A jury found appellant, Phillip Battles, guilty of capital murder,[1] and the trial

court assessed his punishment at life imprisonment. In two issues, Battles challenges

the trial court's denial of his motion to suppress the second of his two statements to

---

[1]     *See* TEX. PENAL CODE § 19.03.

law enforcement, arguing that the trial court erred because the recording of his second statement did not include the warnings required by Texas Code of Criminal Procedure article 38.22 and that the trial court abused its discretion by holding that Battles did not need to waive his rights expressly.

We affirm.

## General Background

On November 14, 2016, Battles and several others were implicated in a string of aggravated robberies and shootings in Houston. At approximately 5:30 p.m., two men stole a black Honda Accord from Brandon Aguilar. The two assailants approached Aguilar, who had just arrived with his three-year-old daughter, outside his home. One man threatened Aguilar with a gun while the other took his keys and ordered Aguilar to remove his daughter from the car. Aguilar complied, and the assailants fled in Aguilar's black Honda.

At around 8:30 p.m., Diana Gomez arrived at her home with her three children. As she unloaded groceries, three men robbed her, demanding that she give them her purse and car keys. A struggle ensued, and one of the assailants began shooting at her and her children with an assault rifle. The men then fled in a "dark four door car." This incident was overheard by nearby residents Armond Ware and his wife, who heard a male voice say, "You think I'm playing with you?" They also heard gunshots, and Ware observed a man with a gun running to the back seat of a

black car. After the men in the black car fled, Gomez realized that two of her children had been shot—including the complainant in this case, her four-year-old child A.C., who had been shot in the head, and her older child who had been shot in the stomach. Gomez herself had seven bullet wounds. They were all taken to the hospital, but A.C. died of her injury.

During the investigation into the robbery and shooting of Gomez, investigators discovered surveillance video showing a black four-door Honda sedan following Gomez into her apartment complex and then leaving again several minutes later. Police also recovered .22-caliber shell casings and a backpack that belonged to Aguilar's daughter that had been stolen several hours earlier.

At approximately 10:00 p.m., Dwayne Gilliam was waiting in a hotel parking lot when two males wearing masks approached his car. One of the men "stuck the barrel of an [assault rifle] in [Gilliam's] face." Gilliam "slapped [the rifle] out of [his] face and then the clip fell out of the gun onto ground [and] bullets fell out." The assailant struck Gilliam with the butt of the rifle, took his car keys, wallet, cell phones, and a laptop belonging to Gilliam's friend Tiffany Gault. Police recovered unfired .22-caliber bullets and part of a gun magazine from the parking lot. Deputy D. Crain, an investigator with the Harris County Sheriff's Office (HCSO), testified that the cartridge casing recovered from the scene of Gilliam's robbery were the

same caliber and brand as the casings fired at Gomez and her children, including the complainant A.C.

At approximately 10:30 p.m., Dalton Olson and Ontario Lavier were attempting to jump start a car in the parking lot of Lavier's apartment complex. A man with a gun approached them while other men surrounded them. One of the assailants pointed an assault rifle at Olson and stole his wallet. Another assailant struck Lavier in the head with a gun, wounding him and causing him to fall to the ground. The assailants then kicked him and eventually fired their weapons at Lavier and Olson, who were able to hide behind a car. The assailants fled in a black four-door sedan.

At the scene of this robbery, law enforcement discovered that six bullets had been fired into the car that Olson and Lavier had hidden behind. They thus recovered an additional shell casing matching those recovered from the shooting of Gomez and her children. Deputy Crain testified that ballistic testing established that the shell casing from Olson and Lavier's shooting was fired from the same weapon as the one used in Gomez's shooting.

Subsequent investigation tied Battles to these crimes. Gault, the owner of the laptop stolen from Gilliam's car, used a GPS device attached to her laptop to locate it after the robbery at an address that was later established to be Battles's address. The black Honda Accord stolen from Aguilar and matching the description of the

4

vehicle in the subsequent crimes was found less than half a mile from Battles's residence. Gilliam's stolen credit card was recovered inside the Honda.

Law enforcement executed a search warrant of Battles's home and collected shotgun shells and a box of .22-caliber ammunition. A search of Battles's cell phone showed that he had purchased a .22-caliber assault rifle a few days before the murder of A.C. Battles's phone also contained videos and screen shots showing Battles and two associates, Marco Miller and Ferrell Dardar, with the assault rifle and a .22-caliber magazine for the rifle. Two days before A.C.'s murder, Battles exchanged text messages with Miller about obtaining bullets for the rifle. On the day after A.C.'s murder, Battles exchanged text messages with Dardar about moving a vehicle.

Finally, Jarvis Payne, who knew Dardar, testified that Dardar contacted him around Thanksgiving 2016, a short time after A.C.'s murder, asking if Payne was interested in buying an assault rifle. Dardar brought the weapon to Payne and showed it off by shooting "the gun in the backyard maybe three of four times in the grass." Payne told Dardar he did not want to buy the gun, and Dardar left, taking the gun with him. Deputy P. Yates with the HCSO testified that investigators located a fired shell casing from Payne's yard. Investigators determined that the casing fired by Dardar into Payne's yard were .22-caliber of the same brand as other casings

recovered in connection with this case. Ballistic testing indicated that the casing from Payne's yard was fired from the same gun that was used in the shooting of A.C.

**Statements to Police and Suppression Hearing**

On November 29, 2016, a couple of weeks after A.C.'s murder and the aggravated robberies, Deputies Crain and J. Brown with HCSO interviewed Battles. The recording began around 3:15 p.m. After having Battles wait for almost an hour and a half, Deputy Brown entered the room and explained Battles's rights to him at approximately 4:40 p.m.:

[Brown]:   Since they arrested you, we got to read you your rights. Do you know what that is?

[Battles]:   No

[Brown]:   Well when someone reads you your rights they tell you—

[Battles]:   Oh yeah, yeah.

[Brown]:   Okay, you understand now and you speak good English, and you read and write English language right?

[Battles]:   [Nods yes.]

. . . .

[Brown]:   Okay, I'm going to read you that stuff real quick before we get started. And I just need you to answer me with a basic you know "yes, I understand," something, like you gotta actually say it. You understand that?

[Battles]:   Yes, sir.

6

[Brown]:      Okay you have the right to remain silent on making a statement at all and any statement you make [can] be used against you at your trial. Do you understand that?

[Battles]:    Yes, sir.

[Brown]:      Anything you say may be used against you in court. Do you understand that?

[Battles]:    [Nods].

[Brown]:      Yeah, you gotta say yes.

[Battles]:    Oh, yes sir.

[Brown]:      You have a right to a lawyer present to advise you prior to [and] during any questioning. Do you understand that?

[Battles]:    Yes, sir.

[Brown]:      If you are unable to employ a lawyer, you have the right to have a lawyer appointed to you prior to and during any questioning.

[Battles]:    Yes, sir.

[Brown]:      And you have the right to terminate this interview at any time. Do you understand that?

[Battles]:    Yeah, that mean end it?

[Brown]:      Yeah.

[Battles]:    Oh, yes sir.

Battles then spoke with the deputies and provided some information to them regarding the offenses that occurred on November 14. He indicated that he had been driving the Honda, and he identified some of the other people who had been with him, including Marcos Miller. Battles denied being involved in the robberies, and

he did not identify the person who shot A.C. After taking several breaks, the deputies terminated the interview just before 10:00 p.m., and Battles was held a little longer while the deputies completed administrative tasks associated with his arrest.

The recording of the second portion of Battles's interview began just over an hour later at approximately 11:00 p.m., with Deputy Brown reminding Battles about the previous interview:

[Brown]:     Alright [Battles] we talked a lot tonight, we talked about a lot of stuff and you gave us some info. We're getting ready to leave and you told one of the guys out there some information might not have been correct about what you said. And you said that you were willing to come back and you know talk again.

[Battles]:   Yeah that boy uh . . .

[Brown]:     Okay, hang, hang on just a second. And the only reason I'm doing this is because I just want to make sure that . . . we're clear that you, you still want to come back and talk to us. Is that correct?

[Battles]:   Yeah.

[Brown]:     Okay, and that nobody out there like threatened you or nobody you know told you that they were going to hurt you or promised you anything or anything like that?

[Battles]:   Yeah.

[Brown]:     Okay, I just gotta make sure. And you still remember everything we said when we read you your rights and you understand everything and nothing's changed in that time, because you've been out there for, I don't know, for about an hour or so waiting on getting finger printed, that kind of stuff?

8

[Battles]:     Yeah.

Battles then told Deputies Brown and Crain that Ferrell Dardar had been involved in the robberies and that Dardar had "hit that girl . . . [w]ith that gun." Battles informed the deputies that Dardar and another accomplice stole the Honda and then picked him up. Battles was driving the Honda, and there were five people total in the car. Battles provided the names of all the people involved and other details of the robberies. This interview lasted approximately 30 minutes.

Battles moved to suppress the statements he made to the investigators. At the suppression hearing, Deputy Brown testified that he and Deputy Crain had questioned Battles, as shown on the recordings and transcript of Battles's statements introduced into evidence. Brown summarized the first interrogation, testifying that Battles appeared to understand when Brown read him his rights and that Battles agreed to answer questions and provide information. Deputy Brown testified that Battles initially denied his involvement in the robberies and shootings that occurred the night of A.C.'s murder. Although Battles provided some useful information for their investigation during the first interview, they "hadn't obtained what [they] felt like was a truthful statement." They did not believe Battles had spoken truthfully about who was involved in the robberies and murder or about his own role in those crimes. They ended the interview, and Brown took Battles out of the interview room so that he could complete his fingerprinting and other booking paperwork.

9

Deputy G. Grifno testified that, while Battles was waiting to be transported to a jail facility, someone had asked Grifno to keep an eye on Battles. Battles asked Grifno what he was being charged with, and Grifno responded that he believed Battles would be charged with murder. Grifno also told Battles that "this is your opportunity to tell the truth, that's why you're in there talking to the investigators, so if you didn't tell the truth, you need to tell the truth about it." Battles told Deputy Grifno that he wanted to talk to the investigators again. Deputy Grifno testified that he did not otherwise discuss the case with Battles. He instead informed Deputy Brown that Battles wished to talk again, and he did not participate any further in the investigation.

Deputy Brown testified that, after Deputy Grifno informed him that Battles wanted to tell the deputies more about what had happened, he and Deputy Crain restarted the interview. Deputy Brown testified that he reminded Battles about his rights as read to him during the first interview, and he confirmed that Battles wanted to make his second statement. Deputy Brown testified that he did not re-read Battles his rights because "it was still what [he] took as the same interview going on that evening." Brown continued, "I mean they'd been read probably four or five hours earlier, he'd been spoken to and I was under the impression that he still understood those. I asked him and he indicated that he did." Deputy Brown testified that during this second interview, Battles provided "a more complete picture" of what had

10

occurred the night of A.C.'s murder, including providing accurate names for the people who had been involved.

Finally, Dr. Timothy Proctor, a clinical psychologist who evaluated Battles, testified at the suppression hearing. Dr. Proctor opined that Battles suffered from an intellectual disability. Battles's IQ was between 65 and 75, which is "subaverage," and evaluations indicated that he also had deficits related to his language skills, particularly in reading and writing. Dr. Proctor testified, "Obviously he is somebody who can speak and you can interact and talk to him and hold a conversation but when I'm talking about language, I'm talking about the level of the language and the ability to both receive language and express language." Dr. Proctor also observed, "But in my general impression was as we would converse that he understood what I was saying to him, understood the questions I was asking, understood why I was there, et cetera."

Dr. Proctor further testified that he did not find any severe deficits in the area of "social domain measures," which Dr. Proctor identified as including "interpersonal skills, social responsibility, self-esteem, gullibility, naivete/wariness, following rules, obeying laws, avoiding being victimized and social problem-solving." Nor did Battles display any serious deficits in the "practical domain," identified as including "activities of daily living/personal care, occupational skills,

11

use of money, safety, healthcare, travel/transportation, schedule/routines and use of the telephone."

The trial court overruled Battles's complaints regarding the admissibility of his second recorded statement.[2] Relevant here, the trial court made the following findings:

> I find the officers who testified were credible. Prior to questioning the defendant, he was given his legal warnings required by Article 38.22 of the Texas Code of Criminal Procedure. Although the defendant was not asked and did not specifically state he waived his right, it was clear from the circumstances surrounding the interview that he did understand his rights, agreed to waive them by speaking to the officer. . . .
>
> The defendant was examined by two psychologists, including Dr. Proctor, and found to be intellectually disabled; however, Dr. Proctor indicated that he could understand basic directions and instructions. [Defendant] scored fairly well in the area of social and practical functioning. He did not have a severe deficit in those two areas. . . .
>
> The first statement to the officers continued until the officer terminated.
>
> Approximately two hours after the officers terminated the interview, . . . the defendant indicated he wanted to speak to the investigators who were questioning him previously, thus, reinitiating the interrogation voluntarily. . . .
>
> A second statement was taken from the defendant. The defendant was asked if he remembered his earlier warnings and he said he did. He also confirmed to the investigators on the recording that he wanted to talk to them and that no one had threatened him or promised him anything

---

[2]   We note that the trial court excluded a portion of Battles's initial statement, concluding that Battles had invoked his right to counsel and, thus, that portion of the statement was inadmissible. Neither party challenges this aspect of the trial court's ruling.

during the interim between the first statement and the second statement in order to continue that interrogation or to give a statement.

The trial court concluded that Battles's "first statement was freely and voluntarily given without threats, promises or coercion." The court also concluded that "[d]espite being diagnosed as intellectually disabled, the defendant understood his legal warnings and waived them." The trial court determined, "No violation of Article 38.22 . . . occurred in either statement." And it held that, "[d]espite the fact that the warnings were not regiven, the Court finds this was not necessary given the relevant case law—given the fact that he was fully warned prior to the beginning of the first statement and understood that he remembered and understood his warnings."

## Admission of Oral Statement

In two issues, Battles complains that the trial court erred in admitting his second interview because that recording did not include the warnings required by Code of Criminal Procedure article 38.22 and that the trial court erred in concluding that Battles "did not need to waive his rights expressly."

**A. Standard of Review**

We review a trial court's denial of a motion to suppress a statement made during a custodial interrogation under a bifurcated standard. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013); *Warren v. State*, 377 S.W.3d 9, 15 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). We review the trial court's factual

13

findings for an abuse of discretion, affording almost total deference to the trial court's rulings on questions of historical fact and mixed questions of law and fact that turn on an evaluation of credibility and demeanor. *Turrubiate*, 399 S.W.3d at 150; *Warren*, 377 S.W.3d at 15. We review de novo the trial court's rulings on questions of law and mixed questions of law and fact that do not turn on evaluation of credibility and demeanor. *Turrubiate*, 399 S.W.3d at 150; *Warren*, 377 S.W.3d at 15.

At a suppression hearing, the trial judge is the sole trier of fact and exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007). If the trial court makes express factual findings, we view the evidence in the light most favorable to the ruling and determine whether the evidence supports the findings. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010); *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (recognizing findings and conclusions may be "stated on the record at the hearing"). We will sustain the trial court's ruling if that ruling is "reasonably supported by the record and is correct on any theory of law applicable to the case." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

**B.    Relevant Law**

For a statement made by a defendant during a custodial interview to be admissible, the law enforcement officer must warn the defendant of his rights before

14

beginning the interview, and the defendant must knowingly, intelligently, and voluntarily waive his rights. *See* TEX. CODE CRIM. PROC. art. 38.22, §§ 2(a)–(b), 3(a)(2); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010). The Code of Criminal Procedure sets out the specific warnings that law enforcement must give to a defendant:

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time.

TEX. CODE CRIM. PROC. art. 38.22, § 2(a).

Article 38.22, section 3 provides further requirements for the admission of oral statements:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:
>
> (1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;
>
> (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused

15

knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

*Id.* art. 38.22, § 3(a).

Thus, an officer must warn a defendant of his rights and obtain a waiver before each custodial interview. *See Jones v. State*, 119 S.W.3d 766, 772 (Tex. Crim. App. 2003). Under certain circumstances, however, an interrogation may include more than one phase. *See id.* Thus, when a suspect is given the required warnings prior to an interview, the warnings from the first interview session remain in effect for continuing sessions, if, in the totality of the circumstances, a second phase of an interview is essentially a continuation of the first. *See Bible v. State*, 162 S.W.3d 234, 241–42 (Tex. Crim. App. 2005); *Franks v. State*, 712 S.W.2d 858, 861 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (it is unnecessary to provide another warning and obtain another waiver if interview is merely continuation of prior interview for which defendant was properly warned and waived his rights). In such a case, the warning and waiver from the initial interview carry forward to the

16

subsequent interview. *See Bible*, 162 S.W.3d at 242; *Sloan v. State*, 418 S.W.3d 884, 890 n.5 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

To determine whether a subsequent interview is a continuation of a prior interview, courts consider, among other factors, (1) the passage of time between the two interviews, (2) whether the interviews were conducted by the same person, (3) whether the interviews related to the same offense, and (4) whether the officer who conducted the subsequent interview asked the defendant whether he had received any earlier warnings, whether he remembered those warnings, and whether he wished to waive or invoke them. *See Bible*, 162 S.W.3d at 242; *Jones*, 119 S.W.3d at 773 n.13.

## C.    Analysis

Battles complains in his first issue that his second interview is inadmissible because the recording does not include the warnings required by Code of Criminal Procedure article 38.22, sections 2(a) and 3(a). The trial court concluded, however, that "[n]o violation of Article 38.22 . . . occurred in either statement," noting that, "[d]espite the fact that the warnings were not regiven [before the second statement], . . . this was not necessary given the relevant case law" and "given the fact that he was fully warned prior to the beginning of the first statement and that he remembered and understood his warnings."

17

The trial court found—and the record supports—that Battles was given the full warnings required by article 38.22, section 2(a), at the beginning of his first interview. The record indicates that the interview process lasted less eight hours, from the time Battles was read his rights during the first interview until the beginning of the second interview. Less than two hours after that first interview ended, Battles reinitiated the interview. He was interviewed by Deputies Brown and Crain in both interviews. The interviews related to the same offenses—the capital murder of A.C. and the related aggravated robberies. Finally, Deputy Brown reminded Battles on the recording of the second interview about the earlier warnings, asking, "[Y]ou still remember everything we said when we read you your rights and you understand everything and nothing's changed in that time[?]." Brown received confirmation from Battles that he remembered the earlier warnings and that he desired to reinitiate the interview. Thus, the record supports the trial court's findings on this issue.

We conclude that the second interview was a continuation of the first one, and so the second interview is admissible even though the full warnings were not re-read on the recording. *See Bible*, 162 S.W.3d at 241–42 (holding that two interrogation sessions less than three hours apart were part of single interview, despite fact that different officers conducted questioning during each session and each session focused on different sets of crimes, when same officers were present during both sessions); *Jones*, 119 S.W.3d at 773 n.13 (noting that "'the mere passage of time'

18

does not, by itself, automatically obviate prior *Miranda* warnings" and suggesting that subsequent interrogation occurring several days after receipt of *Miranda* warnings would have been constitutional if interrogation had been conducted by same officer regarding same crime); *Ex parte Bagley*, 509 S.W.2d 332, 337 (Tex. Crim. App. 1974) ("[T]he express written warning given petitioner some 6 to 8 hours previous to the complained of confession . . . satisfie[s] the dictates of *Miranda*."); *Sloan*, 418 S.W.3d at 890 n.5 (holding that proper warnings given during first interrogation "carried forward" to second interrogation conducted five days later by same officers on same subject matter); *Miller v. State*, 196 S.W.3d 256, 266–67 (Tex. App.—Fort Worth 2006, pet. ref'd) (holding that lapse of four days between time *Miranda* warnings were given and statement was made did not render warnings ineffective when defendant met with officer who had given him warnings on both occasions and questioning dealt with same subject on each occasion); *Stiles v. State*, 927 S.W.2d 723, 729–30 (Tex. App.—Waco 1996, no pet.) (recognizing that where defendant was read statutory *Miranda* warnings at least twice before giving statements to police, whether police subsequently read warnings to defendant again each time he was interrogated was irrelevant).

Battles contends that the trial court erred because it did not, as part of its evaluation of the totality of the circumstances, "give adequate analysis to the fact that appellant is severely intellectually impaired." Battles argues that, due to his

19

intellectual impairments, as testified to by Dr. Proctor, the record does not support the trial court's finding that he could remember and understand the warnings given to him more than seven hours earlier at the beginning of the first interview. Battles also asserts that the trial court's finding "does not take into account [Deputy] Brown's statement just before he read the warnings at the first interview" that he was "going to read [Battles] that [warning] **real quick** before we get started." Battles argues, "[r]eading *Miranda* warnings 'real quick' to an intellectually disabled person with an IQ of 67 does not support a finding by a preponderance of the evidence that" he was "reminded of and indicated he understood and waived his warnings and waived his rights." We disagree that the trial court failed to give proper weight to the evidence of Battles's intellectual impairment in its findings and conclusions.

We observe, first, that Battles mischaracterizes the evidence of his intellectual disability and takes that evidence out of its larger context. Although Dr. Proctor did testify that Battles's IQ was subaverage and that he exhibited impairments in the area of reading and writing, Proctor also testified that Battles did not have any significant impairments in the area of social or practical knowledge. Dr. Proctor testified that Battles "is somebody who can speak and you can interact and talk to him and hold a conversation" and that his "general impression was [that] he understood what I was saying to him, understood the questions I was asking, understood why I was there, et cetera."

20

Deputy Brown also testified that he believed Battles understood the warnings. Regarding the second interview specifically, Brown testified that he did not re-read Battles his rights because "it was still what [he] took as the same interview going on that evening." Brown stated, "[Battles had] been spoken to and I was under the impression that he still understood those. I asked him and he indicated that he did." Furthermore, the interview itself provides some evidence that Deputy Brown provided the required warnings to Battles in a way that ensured Battles could understand his rights and allowed Battles to seek clarification, and that Deputy Brown ensured that Battles remembered that those rights were still in place during the second interview.

These facts from the record support the trial court's fact findings that, although Dr. Proctor "found Battles to be intellectually disabled," Dr. Proctor also "indicated that [Battles] could understand basic directions and instructions," had "scored fairly well in the area of social and practical functioning," and "did not have a severe deficit in those two areas." As the trial court found, Battles "was asked if he remembered his earlier warnings and he said he did." Battles "confirmed to the investigators on the recording that he wanted to talk to them and that no one had threatened him or promised him anything during the interim between the first statement and the second statement in order to continue that interrogation or to give a statement." And these findings by the trial court support the conclusion that,

despite his intellectual disabilities, Battles understood that his second interview was a continuation of the first one and that he would continue to be afforded the same rights.

We further observe that "an accused's mentality is but one factor among many" relevant to the totality of the circumstances under which he made his statement to police. *Delao v. State*, 235 S.W.3d 235, 240 (Tex. Crim. App. 2007). It was appropriate for the trial court here to consider factors such as Battles's experiences, maturity, social, and practical skills in determining that he recalled the previous warnings before making his second statement. *See id.* at 240–41 (holding that totality-of-the-circumstances standard takes into account such factors as "intelligence, age, experience, education, maturity, etc.").

We conclude, as did the trial court, that there was no violation of article 38.22 regarding Battles's second interview. We overrule his first issue.

In his second issue, Battles asserts that the trial court erred in holding that he did not need to waive his rights expressly. The State asserts that Battles waived this argument by failing to adequately brief it, and we agree that Battles did not provide any legal argument or citation to authority supporting this contention. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding

22

appellant waived issue on appeal because of inadequate briefing). Furthermore, we observe that the statute does not require an express waiver and that an accused's waiver of his rights can be inferred from his actions and words. *See Joseph*, 309 S.W.3d at 24; *see also Leza v. State*, 351 S.W.3d 344, 353 (Tex. Crim. App. 2011) ("[W]e have consistently held that waiver of Article 38.22 rights 'may be inferred from actions and words of the person interrogated.'"); *Ellis v. State*, 517 S.W.3d 922, 928 (Tex. App.—Fort Worth 2017, no pet.) (rejecting appellant's argument that detective was required to verbally ask if appellant waived his rights and declining to "read such a requirement into the rule").

We overrule Battles's second issue.

## Conclusion

We affirm the judgment of the trial court.

Richard Hightower
Justice

Panel consists of Justices Keyes, Lloyd, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).