# NO. 12-14-00044-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *SHAKEITHA CARTWRIGHT,*<br>*APPELLANT* | § | *APPEAL FROM THE 273RD* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *THE STATE OF TEXAS,*<br>*APPELLEE* | § | *SHELBY COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Shakeitha Cartwright appeals from her conviction for capital murder. In two issues, she challenges the denial of her motion to suppress. We affirm.

### BACKGROUND

The State charged Appellant with intentionally or knowingly causing the death of Keilly Hoyt, a child. Keilly was Appellant's infant daughter. Investigators conducted two video recorded interviews with Appellant, which she sought to suppress. At the suppression hearing, Kevin Windham, a former investigator with the Shelby County District Attorney's Office, testified that he first encountered Appellant at the hospital when she learned of Keilly's death.[1] He testified that Appellant voluntarily agreed to meet investigators for an interview. Windham testified that Appellant was not under arrest at that time.

Windham and Detectives Nicole Faulkner and Stephen Stroud of the Center Police Department conducted the first interview of Appellant. Before questioning began, Faulkner

---

[1] The Honorable Charles Dickerson held a suppression hearing in July 2013, but never ruled on Appellant's motion to suppress. At trial, the Honorable Charles Mitchell reviewed the record from the suppression hearing and held that Appellant's videotaped statements were admissible and voluntary. In February 2014, Appellant filed her notice of appeal. In March 2015, Judge Mitchell entered nunc pro tunc findings of fact and conclusions of law. Because Judge Mitchell's findings were filed after this Court had received the appellate record and because he had not directly evaluated the witnesses' credibility and demeanor, we ordered Judge Mitchell to conduct a new suppression hearing and to enter findings of fact and conclusions of law.

admonished Appellant of her rights, and Appellant acknowledged that she understood each one. She also signed a card to that effect. She was not handcuffed, threatened, told that she was under arrest, or told that she was free to leave. At one point, Faulkner stated that Keilly appeared to have been murdered, and that Appellant was looking at either a murder charge or something less. When Appellant asked what would happen, Windham replied that she would be arrested and would probably no longer have her other children. She asked Windham why, and he responded that she would be arrested for Keilly's injuries. She also asked for "how long," to which Windham replied that he did not know.

During the interview, Detective Faulkner told Appellant that twelve people would listen to her and not believe her, which would be followed by time in the penitentiary. She also told Appellant that she would not have her other children. Windham explained that Keilly's injuries, combined with the possibility that Keilly suffocated, suggested murder. Faulkner eventually said she was done talking and knew what she was going to do. Shortly thereafter, Appellant agreed to write a statement. Windham reminded Appellant that she was previously admonished of her rights and then left Appellant alone to write her statement. He testified that Appellant was not in custody at this time.

When Windham returned to the room, he re-admonished Appellant. He told Appellant that she was in serious trouble and was looking at a first degree felony, which meant she could spend twenty-five years to life in prison. He advised her that it would be in her best interest to put everything "on the table." Subsequently, Windham again told Appellant that she was going to be arrested and that injury to a child is a first degree felony. He told her that capital murder was the worst case scenario. She asked what she was looking at, and he responded with "serious time in the penitentiary." He told her he was not trying to scare her, and she said, "I know." She was left alone for almost an hour before Detective Faulkner returned and informed her that she was being charged with murder. Windham testified that Appellant appeared to be talking voluntarily throughout the interview. The record also indicates that Appellant declined offers of a beverage, tissue, or "anything" else.

The next day, Detective Stroud saw Appellant at her arraignment. According to Stroud, Appellant asked him about autopsy reports. Stroud told Appellant that she needed to tell the whole truth. He explained the difference between murder and injury to a child, and said he was not sure if capital murder or the "needle" would be pursued. He told her she needed to tell

Windham and Faulkner the truth, after which Appellant stated that she would like to speak with them. Appellant, however, denied volunteering to speak with Windham and Faulkner. She testified that Stroud told her she needed to explain the injuries that Keilly's autopsy showed. According to Appellant, Stroud told her Windham and Faulkner wanted to speak to her again, so she agreed because she thought that is what Stroud wanted. Stroud denied Appellant's version of the events.

Windham, Stroud, and Tony Jasso with the Texas Department of Family and Protective Services conducted the second interview. Appellant was admonished of her rights at the beginning of the interview. She acknowledged her understanding of these rights and again signed a card to that effect. Windham began by stating that he understood Appellant wanted to speak with them, and she nodded her agreement. He explained that she was looking at murder, capital murder, or injury to a child. During the interview, Appellant was asked to demonstrate how she handled Keilly. Using a teddy bear, Appellant demonstrated that she slammed Keilly into her car seat and struck Keilly. Appellant admitted that she needed help and had been called both crazy and bipolar. She said she thought about killing herself, and she cried. During his testimony, Detective Stroud acknowledged that Appellant's statements were more incriminating during the second interview. Appellant testified that she made up her story to satisfy investigators.

Corey McClure, a jail sergeant, testified that he heard Appellant tell Stroud that she had never been in trouble and did not know what to do. He heard Stroud tell Appellant that she would not be charged with capital murder if she did what he said. Appellant testified that what McClure heard was similar or identical to what Stroud said. She recalled Stroud saying that she would get the lethal injection. She testified that this conversation occurred sometime after the second interview. Stroud denied having this conversation with Appellant.

In its findings of fact and conclusions of law, the trial court stated that Appellant's oral and written statements were voluntary and admissible, Appellant received warnings before giving her statements, and Appellant knowingly, intelligently, and voluntarily waived her rights. At trial, the jury charge included instructions on capital murder and the lesser-included offense of first degree murder. The jury found Appellant guilty of capital murder, and the trial court sentenced Appellant to imprisonment for life without parole.

STANDARD OF REVIEW

We review a trial court's suppression ruling under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). First, we afford almost total deference to a trial court's determination of historical facts. *Id*. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Id*. The trial court may believe or disbelieve all or part of a witness's testimony. *Id*. When the trial court makes express findings of fact, we view the evidence in the light most favorable to the trial court's ruling and determine whether the evidence supports these factual findings. *Id*. Second, we apply a de novo review to the trial court's application of the law to the facts. *Id*. We will sustain the trial court's ruling if it is reasonably supported by the record and correct on any legal theory. *Id*. at 447-48.

## SUFFICIENCY OF WARNINGS

In her first issue, Appellant contends that the initial interview began as noncustodial, but became custodial when Windham and Faulkner stated that (1) she would be arrested for the injuries to Keilly, (2) twelve people would listen to and disbelieve her, (3) she would be sent to the penitentiary, (4) she was facing a murder charge, and (5) her kids would no longer be with her. According to Appellant, warnings she received at the beginning of the interview were insufficient because they were given outside the context of a custodial interrogation.[2] Accordingly, Appellant maintains that evidence of her interviews should not have been admitted at trial.

**Facts**

This Court has reviewed both of Appellant's two interviews. At the beginning of the first interview, Faulkner admonished Appellant of her rights, Appellant acknowledged her understanding of these rights, and Appellant signed a card to that effect. Windham testified that he did not re-admonish Appellant after telling her that she would be arrested. Instead, he relied on Detective Faulkner's previous warnings. Before Appellant began writing her statement, Windham reminded Appellant that they previously reviewed her rights and he asked her to initial

---

[2] The State contends that Appellant's first issue is not preserved for appellate review because it does not comport with the complaints she raised at trial. Our review of the record indicates that Appellant presented her complaints, including those raised in her first issue, in a document filed with the trial court regarding her arguments and legal authority. Thus, her complaints are preserved. *See* TEX. R. APP. P. 33.1.

each right. Windham admitted that he did not review the warnings with Appellant at that time. After Appellant wrote her statement, but before she signed it, Windham re-admonished Appellant and instructed her to read each right, initial each one, and sign her name.

**Analysis**

An accused must receive certain warnings before a statement made during custodial interrogation may be used as evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 §§ 2, 3 (West Supp. 2016); *see also Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S. Ct. 1602, 1612, 16 L. E. 2d 694 (1966); *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Here, Appellant argues that, although officers admonished her of her rights at the beginning of the interview, they were required to re-admonish her once the interview became custodial. In support of this argument, Appellant cites *Pecina v. State*, 361 S.W.3d 68 (Tex. Crim. App. 2012).

In *Pecina*, the Texas Court of Criminal Appeals explained that warnings are given immediately before custodial interrogation and those rights can be invoked only within the context of a custodial interrogation. *Pecina*, 361 S.W.3d at 75-76. However, the rule that a law enforcement officer is not required to give warnings outside a custodial setting does not mean that an officer cannot do so as a precautionary measure. *See Dancy v. State*, 728 S.W.2d 772, 777 (Tex. Crim. App. 1987) (noting that the recitation of warnings in a noncustodial setting is indicative of proper cautiousness); *see also Davis v. Allsbrooks*, 778 F.2d 168, 172 (4th Cir. 1985) (to say that the giving of warnings automatically creates custody would "operate as a substantial disincentive to police to inform suspects of their constitutional protections[]" and "would convert admirable precautionary measures on the part of officers into an investigatory obstruction"). Nor does *Pecina* stand for the proposition that warnings given during a noncustodial interview are no longer effective once the interview becomes custodial. Warnings given in an initial interview remain effective as to admissions made during a later interview if, in the totality of the circumstances, the second interview is essentially a continuation of the first. *Bible v. State*, 162 S.W.3d 234, 241–42 (Tex. Crim. App. 2005).

The record in this case shows that Detective Faulkner admonished Appellant, who signed a card acknowledging receipt of the warnings. The conversation consisted of one continuous interview, even after investigators made statements that Appellant contends converted the interview into a custodial interrogation. Assuming, without deciding, that the interview became

custodial, the initial warnings Appellant received remained in effect, and the investigators were not required to repeat them. *See id*.; *Pauley v. State*, No. 05-12-01202-CR, 2014 WL 1018327, at \*6 n.4 (Tex. App.—Dallas Mar. 6, 2014, pet. dism'd) (mem. op., not designated for publication) (new warnings not necessary when appellant was read rights, gave a statement, was arrested, and then participated in a "down and out," in which he went with officers to a location where he met his accomplice on the night of the robbery, as the "down and out" was a continuation of the initial interview). Therefore, the trial court did not abuse its discretion by finding compliance with the warning requirements. *See Valtierra*, 310 S.W.3d at 447-48; *see also Wood v. State*, 18 S.W.3d 642, 646 (Tex. Crim. App. 2000) (trial court's suppression ruling will not be reversed absent clear abuse of discretion). We overrule Appellant's first issue.

## INVESTIGATOR TACTICS

In her second issue, Appellant contends that Detective Stroud engaged in coercive tactics, which renders her statements and the waiver of her rights involuntary. She argues that Stroud linked her credibility with punishment alternatives, leading her to further incriminate herself.

**Facts**

After Detective Stroud entered the first interview, he told Appellant that everyone makes mistakes, does things that they do not intend, and loses patience. He told Appellant that he was trying to help. He explained that intent was the difference between murder and injury, such as if she lost her patience and did not intend to cause harm. Stroud mentioned that perhaps Keilly kept crying and Appellant shook Keilly harder than she thought or was disciplining Keilly. He opined that there was no way she did not know about Keilly's injuries.

At one point, Stroud told Appellant that she did more than she claimed, and that she would be laughed out of court. He added that no one would buy her story and she would be sent away for murder. Stroud told Appellant that investigators knew she "did it," and that she needed to explain her reasoning, which could be the difference between murder and injury. Appellant admitted that she knew "what it looks like." However, throughout the interview, Appellant told Stroud that she was telling the truth and did not want to be "pinned" with murder when she did not kill her baby.

In response to one such occasion, Stroud told Appellant that she needed to explain. He suggested that maybe she got upset, the baby was crying and "pissed [her] off," and she got

6

angry. When he asked Appellant if she trusted him, she responded affirmatively, but she stated that she did not want something "pinned" on her that did not happen. Stroud told her that investigators needed to know the truth because the "s---" she was saying is not the truth. He opined that she was telling only part of the truth, what she said did not "add up," and she was "softening the blow." Appellant told Stroud that she was being honest about what happened to Keilly.

Stroud told Appellant that he was going out of his way to help her. He explained that she would find herself in a world of stories from which she could not escape and that would make her out to be a liar before she even got to court. He stated that this was her chance to explain what really happened, i.e., that she was upset and did not intend to cause Keilly's injuries or kill Keilly. He suggested that a jury would know she is "full of bologna." Appellant insisted, more than once, that she was telling the truth. Stroud told Appellant that she could be sentenced to two to twenty-five years in prison or that the needle might even be pursued. He informed her that she needed to get her "s---" together. She replied, "I am." At one point, Appellant said she would just say that she "did it." Stroud and Windham both objected, and told her that they only wanted the truth.

Later on, Appellant expressed her belief that murder kept being thrown at her and that Stroud was trying to say she lied. She again insisted that she was telling the truth. Stroud told Appellant that he wanted her to write down each injury and explain the cause of each one. She asked if she had to, and Stroud told her that she did not, but that it would explain what happened. Appellant expressed concern that it would not matter because she was going to be blamed for murder. Towards the end of the interview, Appellant told Investigator Windham that she felt forced to admit things that she did not do. Windham told her that he did not want her to feel forced, but she responded that she did feel that way and was just being honest with him.

During the second interview, Stroud expressed his belief that Appellant was more concerned about getting into trouble with the law than she was about Keilly. He stated that this made her one of the worst, evil people that he could imagine. He told her that she was no different than the guy who shot kids in a school. He also told her he did not have the words to tell her what he thought and he should probably "just shut it down." He explained that the autopsy would show if there was any pressure behind Keilly's head and they would be able to

identify the cause of death. Appellant asked how he was helping her because it sounded like he was turning against her.

At the suppression hearing, Appellant testified that she made false statements during the interviews based on what she believed Detective Stroud wanted to hear. She testified that she was afraid of the "lethal injection" and she believed that if she said what Stroud wanted her to say, she would receive two to twenty or twenty-five years in prison. She testified that, when Stroud took her to be booked in at the jail, he told another officer that he would ensure that Appellant went "down" and he mentioned the lethal injection. Stroud admitted accompanying Appellant to be booked in, but he denied mentioning the lethal injection.

## Applicable Law

An accused's statement may be used in evidence if it was freely and voluntarily made without compulsion or persuasion. TEX. CODE CRIM. PROC. ANN. art. 38.21 (West 2005). The defendant may claim that a statement was not freely and voluntarily made and thus may not be used as evidence under (1) Article 38.22, section 6 (general voluntariness); (2) *Miranda* as expanded in Article 38.22, sections 2 and 3 (the Texas confession statute); or (3) the Due Process Clause. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). Claims of involuntariness under Article 38.22 can be, but need not be, predicated on police overreaching, and they can involve sweeping inquiries into the defendant's state of mind. *Id*. at 172. Article 38.22 is aimed at protecting suspects from police overreaching, but may also be construed as protecting people from themselves because the focus is on whether the defendant's statement was voluntary. *Id*.

*Miranda* protects defendants from government coercion that led them to surrender rights protected by the Fifth Amendment. *Id*. at 170. A statement may be involuntary under the Due Process Clause only when there is police overreaching. *Id*. at 169. A statement is voluntary absent coercive police activity. *Id*. at 170. The Due Process Clause is intended to protect suspects from police overreaching, but not to protect people from themselves or other private actors. *Id*. *Miranda* and Due Process Clause claims of involuntariness do not require sweeping inquiries into the defendant's state of mind, but involve an objective assessment of police behavior. *Id*. at 171.

8

**Analysis**

Appellant's testimony establishes that the alleged conversation with Detective Stroud, in which he said she would not be charged with capital murder if she did what he said, occurred after Appellant's two interviews. Accordingly, the conversation could not have influenced the voluntariness of her statements. Moreover, Stroud denied making the alleged statements and, as sole judge of the weight and credibility of the evidence, the trial court was entitled to accept his testimony over contrary evidence. *See Valtierra*, 310 S.W.3d at 447.

As for Stroud's conduct during the interviews, the record does not indicate that Stroud employed the type of brutal "third-degree" tactics that would render a statement involuntary. *See Estrada v. State*, 313 S.W.3d 274, 297 (Tex. Crim. App. 2010). Stroud remained relatively calm and civil throughout the interviews and, while forceful with his questioning, was not aggressive. Both he and Investigator Windham discouraged Appellant from speaking anything other than the truth. Stroud's questioning of Appellant's credibility, expressing his opinion as to the charges and punishment she might face, and making suggestions as to what she could say to obtain a lesser charge do not rise to the level of coercion that would render Appellant's statements involuntary. *See id.* at 297-98; *see also Oursbourn*, 259 S.W.3d at 170-73 (identifying types of scenarios that may give rise to a claim of involuntariness); *see also Mason v. State*, 116 S.W.3d 248, 260-61 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (recognizing absence of per se rule against use of psychological tactics, and that predictions about future events not tantamount to promise). The record also demonstrates that Appellant possessed the basic reasoning skills necessary to understand her rights, and she readily conversed with investigators. *See Gomes v. State*, 9 S.W.3d 373, 377 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Under these circumstances, we conclude that the trial court did not abuse its discretion by finding Appellant's statements and waiver of her rights to be voluntary. *See Valtierra*, 310 S.W.3d at 447-48; *see also Wood*, 18 S.W.3d at 646. We overrule Appellant's second issue.

**DISPOSITION**

Having overruled Appellant's two issues, we ***affirm*** the trial court's judgment.

**JAMES T. WORTHEN**
Chief Justice

Opinion delivered August 17, 2016.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(DO NOT PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

### AUGUST 17, 2016

### NO. 12-14-00044-CR

**SHAKEITHA CARTWRIGHT,**
Appellant
V.
**THE STATE OF TEXAS,**
Appellee

Appeal from the 273rd District Court

of Shelby County, Texas (Tr.Ct.No. 2013CR-18695)

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*