## In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-18-00406-CR
_____

### THE STATE OF TEXAS, Appellant

### V.

### GERARD DANTE SIMMONS, Appellee

---

**On Appeal from the 75th District Court**
**Liberty County, Texas**
**Trial Cause No. CR32855**

---

### MEMORANDUM OPINION

Gerard Dante Simmons (Simmons, Defendant, or Appellee) was indicted for

the murder of Latasha Evette Rucker a/k/a Latasha Green. The State alleged that on

or about the 15th day of August 2016, Simmons

> intentionally or knowingly cause[d] the death of . . . Latasha . . . by
> applying pressure to [her] neck and/or throat area . . . with an object
> unknown [] restricting the airway and/or blood flow of Latasha [] until
> she was dead; and/or by applying pressure to the neck and/or throat area
> of Latasha [] with the defendant's hands, restricting the airway and/or
> blood flow of Latasha [] until she was dead[.]

1

Simmons moved to suppress evidence and argued that the State violated his rights under "Texas Statute[s]" and the "United States and Texas Constitutions" by obtaining his statements after placing him in custody without a knowing and intelligent waiver of his rights and ignoring his desire to terminate the interrogation. Simmons moved to suppress the statements he made during two interrogations and any evidence discovered from the statements. Simmons filed a brief in support of his motion to suppress. After holding a hearing, the trial court granted the motion to suppress. The State filed an appeal. We affirm in part and reverse in part.

<u>Suppression Hearing</u>

The trial court held an oral hearing on the motion to suppress and heard testimony from the State's witnesses Kevin Cooke, John Shaver, and Darrel Broussard. During the hearing the trial court admitted three DVDs into evidence without objection. The first DVD, State's Exhibit 1, contains video recordings from an officer's body camera and video cameras in the jail and generally depicts Simmons when he was first taken into custody, as well as Simmons's booking and initial contact with officers at the jail. The second DVD, State's Exhibit 2, includes recordings of what the parties describe as the "initial interrogation" or the "first interrogation" of Simmons. In the initial interrogation, Simmons is questioned by two Cleveland Police officers. The second DVD also contains video of the exchange

2

between the Cleveland Chief of Police and Simmons that took place in the hallway or corridor at the jail, after Simmons left the interview room from the initial interrogation and as Simmons was being escorted back to his cell. The third DVD, State's Exhibit 3, includes video of what the parties and the trial court refer to as the "second interrogation" of Simmons. The second interrogation was conducted by the Cleveland Chief of Police and a Liberty County Sheriff's Deputy who was not part of the initial interrogation. The parties stipulated that the initial interrogation lasted two hours and was on August 15, 2016, from approximately 6:15 p.m. to 8:15 p.m. The parties also agreed that the second interrogation was on August 16, 2016, and it began around 1:00 a.m.

The testimony from the State's witnesses at the suppression hearing established that Darrel Broussard, the City of Cleveland Chief of Police (Chief Broussard), received a telephone call from Simmons's mother (the Mother). The Mother told Chief Broussard that her son Gerard told her that he killed Latasha. Cleveland police officers responded to the Mother's call, spoke with the Mother, found Simmons outside, restrained him, arrested him for public intoxication, transported him to the jail, and placed him in a jail cell.

Officer Cooke testified that he was involved in the initial interrogation of Simmons in August 2016 conducted as part of the Latasha Green missing person

3

case. He testified he knew from previous cases that Simmons was Latasha's boyfriend, and he had obtained information that Simmons told his Mother that he had killed Latasha. Cooke testified that the interrogations were recorded and were not edited or altered. Cooke agreed that Simmons was in custody and not free to leave at that time. Cooke identified State's Exhibit 2. Cooke also identified the voices on the recordings in State's Exhibit 2 as the voices of Officer Cooke, Detective Shaver, Sergeant Edwards, Chief Broussard, and Simmons. Detective Shaver and Officer Cooke conducted the initial interrogation recorded on Exhibit 2. According to Cooke, Detective Shaver read Simmons what is commonly called a "*Miranda* warning," and Cooke agreed that they informed Simmons that he had the "right to terminate the interview at any time[.]" Cooke testified that Simmons did not "explicitly ask for an attorney[,]" and he did not ask for clarification of his rights. During the initial interrogation, Simmons mentioned a different case that Detective Shaver had investigated that involved a member of Simmons's family. Cooke testified he was not involved in that investigation. According to Cooke, he had also previously spoken with Simmons on the telephone about an earlier altercation between Simmons and Latasha, and at that time Simmons said he was "trying to get his life together[,]" he planned to play arena football, and he was working in Houston. At that time Cooke said Simmons seemed "normal." Cooke testified that

4

when he interviewed Simmons on August 15th, Simmons seemed "abnormal" in that he had "heavy breathing, flexing of the muscles, [] from one extreme emotion to the next[, and] back and forth reciting numbers with no idea what the numbers were for." Cooke agreed that Simmons appeared to have moments of clarity and moments of confusion. Cooke also agreed that the video shows that during the interrogation Simmons says "Leave me alone. Please leave me alone." Cooke testified that he believed this statement by Simmons meant Simmons wanted Cooke to quit bothering him. When asked why they did not leave Simmons alone, Cooke answered

> [i]n the context of this interview I didn't leave him alone because we were trying to find a missing person.
>
> We were trying to find Latasha Green. We were told that he killed her. So, we were trying to find her body to return it to her family.

According to Cooke, he told Simmons to sit down at one point and Simmons said, "I don't want to talk about nothing, man." Cooke explained that during the interview the officers opened the interview door and said, "Come on. Get your stuff and let's go," and Simmons continued to sit there. According to Cooke, at another point Simmons said "I don't want to help y'all do nothing. You ain't trying to help me do nothing[.]" Cooke testified that he believed Simmons meant, "You help me I help you." Cooke agreed that Simmons said, "I don't want to talk about nothing else no more[,]" and Simmons said "I'm guilty. I'm black[.]" Cooke testified that after

5

he and Shaver finished interviewing Simmons, and after exiting the interview room to walk Simmons back to his cell, Chief Broussard spoke to Simmons in a corridor of the jail. According to Cooke, during the exchange in the corridor, Simmons told Chief Broussard "Wells Cemetery Road to the left[]" and that Simmons said, he "didn't care if his life was over with." The trial court asked Cooke how much time had passed from the time they left the interview room and the time when Simmons made the "Wells Cemetery Road" statement. Cooke answered, "[a]pproximately one minute."

Cooke testified that during the initial interrogation Simmons never requested an attorney, and he never unequivocally requested to terminate the interview, nor did he invoke his right to remain silent. Cooke recalled that, even after Simmons made statements about not wanting to talk, Simmons would then continue to talk and sometimes just say "[n]ext question[,]" or "Speak, Willie Lynch[.]" According to Cooke, "[Simmons] just didn't show any indication that he wanted to get up and leave the interview."

On cross-examination Cooke testified that when Simmons said, "I don't even want to talk to you at all, period, about nothing about nothing[,]" it was ambiguous. Cross-examination continued about further statements made by Simmons:

Q. Just before 20:17, is that your voice we're hearing?

6

A. I believe so.

Q. And you say, "If you knew where she was, would you tell us so we could find her," and there's a pause and dead air silence.
	You say, "Her family is awful worried about her," and there is a pause, dead air. Then he says, "I don't want to talk no more. This is manipulative." Did you hear that?

A. I did.

Q. Is that ambiguous, "I don't want to talk no more," when you're asking him a direct question about where she is?

A. Yes.

Q. That's ambiguous to you?

A. Yes.

. . . .

Q. And either you or another officer in the room says, "We're not trying to manipulate you at all, brother," and he again says, "I don't want to talk," correct?

A. Yes.

Q. Is that ambiguous?

A. Yes.

. . . .

Q. So, at 22:18 he says, "I don't want to talk. That's my woman. Leave me alone. Please leave me alone." Is that what happens?

A. Yes.

7

Q. Is that ambiguous?

A. Yes.

Detective Cooke agreed that Simmons was arrested for public intoxication, that he was intoxicated, and that at the time Cooke believed Simmons "wasn't right mentally[.]"

Detective Shaver testified that he participated in the initial interrogation of Simmons on August 15, 2016, and that he had spoken to Simmons on at least ten prior occasions dating back from when Shaver first joined the Cleveland Police Department. Shaver testified that Simmons acted differently in the August 15th interview as compared to their previous encounters in that Simmons was "agitated[,] . . . mumbling on[,] . . . was speaking blurting out numbers[, and] [h]e slammed his head against the table." On one of the prior occasions he had spoken to Simmons to investigate someone else for the assault of a member of Simmons's family. But no arrest was made in that case. According to Detective Shaver, about seven minutes into the initial interrogation Simmons said, "I don't want to talk to you at all about nothing for nothing, period[,]" he believed Simmons meant that he did not want to talk to "[Shaver] personally[]" because Simmons also said Shaver did not care about the assault of the family member, and Shaver believed it was not that Simmons did not want to talk about Latasha Green. Shaver agreed that at another point Simmons

8

said "6 all I got to say[,]" but that Shaver thought this was "[g]ibberish[]" and did not know what Simmons meant by the statement. Shaver did not understand this statement to mean Simmons was invoking his right to remain silent, or to an attorney, or to terminate the interview. When asked at the hearing, "Did you take any statement that Mr. Simmons made during the course of this interview considering the entirety of the interview to invoke clearly, unequivocally, unambiguously any of those rights[,]" Shaver responded, "Absolutely not. . . . He never said that he wanted an attorney, never told me that he didn't want to talk about what we were there for." Shaver agreed that he based this opinion on his understanding of the "totality" of the flow of the interview, the context of the interview, and Simmons's actions. When Shaver heard Simmons say, "Don't even talk to me," Shaver thought Simmons made that statement because he was angry with Shaver.

On cross-examination Shaver was questioned about different statements by Simmons:

> Q. So, not only did you hear him say, "I don't even want to talk to you at all, period, about nothing about nothing," you heard that?
>
> A. I did.
>
> Q. So, he didn't limit that to the investigation of the assault of his [family member], did he?
>
> A. I'm not sure exactly what he meant.

9

Q. Listen to my question: Did he limit his desire not to talk to you just to the investigation of the assault of his [family member]?

A. It sounded like he said he didn't want to talk about nothing about nothing.

Q. So, that's not limited to just his [family member]?

A. I would agree.

Q. He said he didn't want to talk about nothing?

A. Right.

Q. About nothing?

A. Right.

Q. Would you agree with me that "I don't want to talk about nothing" includes the reason he's being interrogated about Latasha Green?

A. It could encompass anything.

Q. As a matter of fact, nothing encompasses everything, doesn't it?

A. Exactly.

The Defense Attorney also used specific segments of the video from the initial interrogation in his cross-examination of Detective Shaver, with each segment referencing statements made by Simmons.

. . . .

Q. 45:40, "I don't want to talk about nothing else no more." 49:36, "Stop playing with me. Stop playing my head." 59:33, "I don't want to talk about that on recorded and on camera."

10

This is an hour and 53 into it, hour and 5324, "I don't want to talk to you, man. Leave me alone."

A. I'm not sure exactly where in the interview, but I did get up and leave.

Q. Okay. But all of those are reflected on those recordings, correct?

A. I agree, yes, sir.

Q. Did you terminate the interview when he said any of those declarations that he didn't want to talk?

A. Absolutely. We tried.

Q. You tried to immediately stop that interview?

A. Absolutely.

Q. You got up and walked out and said, "We're not going to talk anymore"?

A. I got up, opened the door, told him to get his stuff. Let's go. He didn't want to. He continued the conversation.

Q. After each one of those statements, you opened the door and tried to take him back to the cell?

A. Not after each one statement.

Cleveland Police Chief Broussard testified that he talked to Simmons in the hallway on August 15, 2016 about a missing person, Latasha Green. Chief Broussard testified that he did not make any threats to Simmons, did not exhibit any firearms, and did not exhibit any coercion. The State played a segment of the video that depicts

11

the Chief speaking to Simmons in the hallway, and the Chief agreed at the hearing that on the video Simmons can be heard saying "Wells Cemetery Road." According to Chief Broussard, the officers from the Cleveland Police Department went to Wells Cemetery Road where they recovered the body of Latasha Green. Chief Broussard testified that after law enforcement recovered the body, he accompanied Sergeant Lasko from the Liberty Sheriff's Office and they conducted another interview of Simmons. Chief Broussard testified that he read Simmons his rights as recorded on State's Exhibit 3 and the Chief did not receive any indication that Simmons did not understand his rights or that he wanted to invoke any of his rights. In Chief Broussard's opinion, Simmons never invoked his right to remain silent, his right to terminate the interview, or his right to an attorney.

On cross-examination, Chief Broussard testified as follows:

Q. At the time that you had talked to him -- well, let me back up. You knew why he was in your facility up in Cleveland, correct?

A. My understanding he was there because he was intoxicated and was acting a bit out of the norm in his grandma's backyard.

Q. So, he was arrested officially for public intoxication, right?

A. Officially, yes.

Q. But you also knew that he was a suspect in the disappearance and death of Latasha Green, correct?

12

A. I know we were looking for Latasha. Her mom had reported her missing, and her family had been in communication with me about trying to help locate her.

Q. You were in possession of some information indicating that she was dead and he was responsible?

A. After receiving a call from Ms. Mary Simmons, I did have some information.

Q. And that's before you went out and arrested Mr. Simmons?

A. We went to go talk to -- Ms. Simmons requested that we come to her home.

Q. Were you in possession of that information before you went and arrested him for public intoxication?

A. Yes, we were.

Q. So, you knew why he was in jail and why he was being questioned?

A. At the time he was arrested for the public intoxication, and later it led to us interviewing about four or five hours later after we felt that he was maybe more suited to talk to and not under an intoxicated state.

Q. More suited. You would agree with me then he was definitely under the influence of something?

A. I would say he was.

Q. And at one point in this second interview there is even discussion about the fact that he's on PCP or wet, correct?

A. That is correct.

Q. And that's the second one that's taking place at 1:00 in the morning?

13

A. Yes.

Q. So, if we're talking about him being strung out at 1:00 in the morning he was definitely under the influence on that first interview, correct?

A. There could have been some indications. He would at times act properly, and then there were times he would act unreasonable.

According to Chief Broussard, during the four-hour period between the first and second interrogation the Cleveland police were out looking for Latasha Green, and they were still investigating what happened. Chief Broussard agreed that he watched the initial interview either from the other side of the glass or on a video monitor as Simmons was being interviewed, but he testified that he may not have watched the entire interview. Chief Broussard testified that generally the word "attorney" is a key word when someone wishes to invoke their right to an attorney or their Fifth Amendment right. He agreed that the statement "I don't want to talk to you about nothing[]" may signal "a time to stop." Chief Broussard agreed he may have heard Simmons say in the initial interrogation that he did not want to talk but then Simmons was given the opportunity to return to his cell and he instead continued to talk.

During the second interrogation, Sergeant Lasko asked Simmons, "where is Latasha at[,]" and Simmons answered, "She's in the woods . . . Wells Cemetery." Lasko then asked, "Who put her there?" Simmons answered, "I did." The Chief also

asked Simmons "what happened yesterday, tell me what happened," and Simmons answered, "I killed Latasha Green." Simmons explained that he "strangled her" with his "bare hands." When Sergeant Lasko asked Simmons if he meant to do what he did, Simmons answered, "No . . . I didn't, . . . I'm tripping . . . I'm crazy."

Simmons told Lasko and Broussard that he put Latasha's body in the trunk of her car and drove the car to Wells Cemetery Road, and he had a black and red shovel in the trunk that he planned to use to bury Latasha, but the shovel broke at some point. Lasko asked Simmons why he put Latasha on Wells Cemetery Road, and Simmons answered, "I thought it would be a good place to hide a dead body." Simmons told them he left Latasha's body in the woods on Wells Cemetery Road and drove away and then wrecked her car in the "ditch line." Simmons said that after he wrecked her car a stranger stopped and gave him a ride to the road near his friend Crystal's house, and he then stayed the rest of the day with Crystal and "did cocaine all day." According to Simmons, later he went to his grandmother's house to take a bath. Simmons also told Lasko that he had just recently gotten out of prison, and that Latasha gave him the cocaine. At some point in the second interrogation, Simmons also told Lasko and Broussard that he broke Latasha's cell phone and put it into a dumpster behind a motel.

The Defense did not present any witnesses or evidence during the hearing. At the end of the hearing, the trial court asked the parties to brief the issues and the applicability of article 38.22, section 3(c), and the right to terminate an interrogation, as well as to review several cases.[1] The trial court reconvened the hearing at a later date and announced its ruling granting the motion to suppress. The trial court signed a written Order Sustaining Defendant's Motion to Suppress Statements and Findings of Fact in Support Thereof.

In its written order, the trial court found:

---

[1] The trial court asked the parties to brief the application of article 38.22, section 3(c) of the Texas Code of Criminal Procedure, *Miranda v. Arizona*, 384 U.S. 436 (1966); *Michigan v. Mosley*, 423 U.S. 96 (1975); *Watson v. State*, 762 S.W.2d 591 (Tex. Crim. App. 1988); *Marshall v. State*, 210 S.W.3d 618 (Tex. Crim. App. 2006); *Woods v. State*, 152 S.W.3d 105 (Tex. Crim. App. 2004); and *Perillo v. State*, 758 S.W.2d 567 (Tex. Crim. App. 1988). The original clerk's record reflects that Simmons filed a Brief in Support of Defendant's Motion to Suppress Evidence on October 15, 2018. After the appeal was filed and after the original clerk's record was filed in the appeal, the Liberty County District Attorney filed a letter with the Liberty County District Clerk requesting a supplemental clerk's record, and it was then prepared and filed in the appeal as a supplemental record. In the letter that appears in the supplemental record, the District Attorney states that he "hand delivered" certain documents to the trial court on October 15, 2018. The documents referenced in the letter include a copy of the "State's Brief in Support of Admissibility of Statements[,]" and "State's Proposed Findings of Fact for Purpose of Jackson v. Denno and Article 38.22 Texas Code of Criminal Procedure[.]" Simmons argues on appeal that "[t]he State did not file a brief, but later sought to supplement the Clerk's Record on December 18, 2018" with documents allegedly delivered to the trial court on October 15, 2018.

16

1. The Defendant was under arrest at the time of the interrogations.

2. The Defendant was in custody during the interrogations.

3. Officers of the Cleveland P.D. read the Defendant the warnings required by Article 38.22 Tex. Code Crim. Pro[c]. prior to the initial interrogation.

4. Officers of the Cleveland P.D. conducted each interrogation of the Defendant.

5. The Defendant was under the influence of intoxicants at the time of the interrogations.

6. The Defendant repeatedly invoked his right to terminate the initial interrogation and to remain silent in the following statements:

   a. I don't even want to talk to you at all, period. About nothing. About nothing. [S-2 8:38]
   b. Six is all I got to say. Six is all I got to say. [S-2 8:56]
   c. Don't talk to me. [S-2 9:15]
   d. That's all I have to say. [S-2 9:42]
   e. I don't want to talk no more. [S-2 20:17]
   f. I don't want to talk. [S-2 20:36]
   g. I don't want to talk. [S-2 22:15]
   h. Leave me alone. Please leave me alone. [S-2 22:22]
   i. I don't want to talk about nothing man. [S-2 31:10]
   j. I don't want to talk about nothing else dealing with this shit, man. [S-2 35:55]
   k. I don't want to help y'all do nothing. [S-2 37:22]
   l. I don't want to talk about nothin' else no more. [S-2 45:40]
   m. Stop playing with me; stop playing with my head. [S-2 49:36]
   n. I don't want to talk about that on recorded and on camera. I don't want to talk about this [S-2 59:33]
   o. I don't want to talk to you man. [S-2 1:53:24]

7. The Defendant's statements and invocations enumerated above were not ambiguous and constituted a clear expression by the Defendant that all questioning should terminate.

8. The interrogating officers did not immediately discontinue questioning of the Defendant once he invoked his right to terminate the interrogation.

9. The interrogating officers did not scrupulously honor the Defendant's invocation of his rights to terminate the interrogation and remain silent.

10. During the course of the initial interrogation and after the Defendant invoke[d] his right to terminate the interrogation as set forth in 6 above, the Defendant – in response to continued questioning – disclosed the location of the body of Latasha Green, ("the Decedent").

11. Utilizing the information provided to it as set forth in 10. above, law enforcement found and took possession of the body of the Decedent and a shovel found near the body.

12. After two (2) hours of questioning and after the Defendant made the disclosure set forth in 10. above, the officers placed the Defendant back in his cell.

13. At approximately 1:00 a.m. on August 16, 2016, officers woke the Defendant and removed him from his cell.

14. Officers of the Cleveland P.D. again read the Defendant his Art. 38.22 warnings.

15. The officers continued to interrogate the Defendant about the body of the Decedent that was found as a result of the initial interrogation.

16. The State failed to show sufficient attenuation between the initial interrogation of the Defendant and the continuation thereof after locating the body of the Decedent.

17. The second interrogation constitutes a continuation of the initial interrogation and is likewise tainted due to the findings set forth in 6-9 set forth above.

18. The body of the Decedent and the shovel constitute evidence obtained by law enforcement in violation of the Constitution and laws of the State of Texas.

The Court finds that the Defendant's statements were not made under voluntarily [sic] conditions due to law enforcement's failure to scrupulously honor the Defendant's unambiguous request to discontinue the interrogation.

The Court further finds that all evidence obtained by law enforcement and having a direct nexus to the disclosure made by the Defendant during the course of the interrogations, together with any analysis thereof and opinions associated therewith, is inadmissible during the trial of this case pursuant to Article 38.23 of the Code of Criminal Procedure.

## Issue on Appeal

The State argues on appeal that the trial court erred in granting the motion to suppress. According to the State, the trial court erred in finding that the Appellee's statements were not made under voluntary conditions "due to law enforcement's failure to scrupulously honor Appellee's unambiguous requests to discontinue the interrogation[]" because Appellee's requests were ambiguous. The State also contends that the statement Simmons made to Chief Broussard in the corridor about

19

the location of the body is admissible under article 38.22, section 3(c) of the Texas Code of Criminal Procedure. The State also argues that the trial court erred in concluding "all evidence obtained by law enforcement and having a direct nexus to the disclosure made by Appellee during the course of the interrogations, together with any analysis thereof and opinions associated therewith, is inadmissible during the trial of Appellee's case." The State emphasizes that the officers complied with *Miranda* and article 38.22, and that "[n]oncompliance with art. 38.22's statutory component does not require exclusion of Appellee's subsequent oral statement."

Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). We afford almost total deference to a trial judge's determination of historical facts, especially when those determinations are based on assessments of credibility and demeanor. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). A reviewing court will also give deference to the trial court's rulings that apply the law to the facts if those determinations turn on credibility or demeanor. *Id.* A reviewing court reviews de novo mixed questions of law and fact that do not turn on credibility and demeanor. *Id.* At a suppression hearing, the trial judge is the sole trier of fact

20

and exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007).

The same deferential standard of review applies to a trial court's determination of historical facts, demeanor, and credibility even when that determination is based on a video recording. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013). The Texas Court of Criminal Appeals has expressly rejected the proposition that a video changes the "almost total deference standard." *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). Still, we must determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the trial court's fact findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). We may reject a trial court fact finding if it is contrary to "indisputable visual evidence[.]" *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000); *State v. Houghton*, 384 S.W.3d 441, 446 (Tex. App.—Fort Worth 2012, no pet.) (the reviewing court is to give almost total deference to the trier of fact's factual determinations unless the video recording indisputably contradicts those findings).

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case, even if the trial court gave the wrong reasons for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App.

21

2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003). When the trial court makes explicit fact findings, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818; *see also State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (recognizing findings and conclusions may be "stated on the record at the hearing[]"). We then exercise de novo review of the trial court's legal rulings unless the trial court's explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 818.

The Fifth Amendment, *Miranda*, and Texas Statutory Warnings

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (citing *Malloy v. Hogan,* 378 U.S. 1, 8 (1964)). Consistent with this Fifth Amendment guarantee, law enforcement officials, before questioning a person in custody, must inform a suspect that he has the right to remain silent and that any statement he makes may be used against him. *Dickerson v. United States*, 530 U.S. 428, 435 (2000); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "If the individual indicates in any manner, at any time prior to or during questioning, that

22

he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. "But, an officer need not stop his questioning unless the suspect's invocation of rights is unambiguous, and the officer is not required to clarify ambiguous remarks." *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). If a person who is in custody invokes his Fifth Amendment right to remain silent, then the admissibility in court of statements obtained thereafter depends on whether the person's right was "scrupulously honored." *Ramos*, 245 S.W.3d at 418 (citing *Michigan v. Mosley*, 423 U.S. 96, 104 (1975)). The Court of Criminal Appeals has explained that the Supreme Court found in *Mosley* that several factors are important to this analysis including (1) whether the suspect was informed of his right to remain silent prior to the initial questioning; (2) whether the suspect was informed of his right to remain silent prior to the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether the subsequent questioning focused on a different crime; and (5) whether police honored the suspect's initial invocation of the right to remain silent. *Maestas v. State*, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999) (citing *Mosley*, 423 U.S. at 103-05). There is no "*per se* proscription of indefinite duration upon any further questioning[.]" *Mosley*, 423 U.S. at 102-03. Each case must be evaluated based on its facts, after examination of the *Mosley* factors, and "we also consider other facts and circumstances" such as do the facts

23

show there was coercion, threats, or promises to the suspect, was the suspect given basic necessities, and was additional information obtained from the ongoing investigations that tended to show the suspect was present at the scene of the crime. *Maestas*, 987 S.W.2d at 64. "*Mosley* created an ad hoc test in which 'courts must evaluate the facts of each case to determine if the resumption of police interrogation was consistent with scrupulous observance of the *right* to cut off questioning.'" *Id.* at 62 (citations omitted, emphasis added).

*Miranda* warnings must include a statement informing the individual of the right to remain silent, that any statement made by the defendant may be used as evidence against him, that he has the right to have an attorney present during questioning, and he has the right to have an attorney appointed if he cannot afford one. *Miranda*, 384 U.S. at 444. The warnings required by article 38.22 of the Texas Code of Criminal Procedure incorporate *Miranda*, as well as an additional warning stating that the suspect "has the right to terminate the interview at any time[.]" Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a). Article 38.22 outlines when the defendant's statements may be used at trial. Section 2(a) of article 38.22 bars admission of a defendant's *written statement* unless the statement on its face shows the defendant has been warned of the following:

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

(2) any statement he makes may be used as evidence against him in court;

(3) he has the right to have a lawyer present to advise him prior to and during any questioning;

(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5) he has the right to terminate the interview at any time[.]

Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a).

Article 38.22, section 3 governs *oral statements*, and provides:

(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

(1) an electronic recording, which may include motion picture, video tape, or other visual recording, is made of the statement;

(2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

(3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

(4) all voices on the recording are identified; and

(5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

. . . .

(c) Subsection (a) of this section shall not apply to any statement which contains assertions of facts or circumstances that are found to be true and which conduce to establish the guilt of the accused, such as the finding of secreted or stolen property or the instrument with which he states the offense was committed.

. . . .

(e) The courts of this state shall strictly construe Subsection (a) of this section and may not interpret Subsection (a) as making admissible a statement unless all requirements of the subsection have been satisfied by the state, except that:
    (1) only voices that are material are identified; and
    (2) the accused was given the warning in Subsection (a) of Section 2 above or its fully effective equivalent.

*Id.* § 3.

Subsection 3(c) provides an exception that allows certain types of oral statements to be admissible despite the failure to comply with the requirements of subsection 3(a). *See Watson v. State*, 762 S.W.2d 591, 593-94 n.3 (Tex. Crim. App. 1998); *Moore v. State*, 999 S.W.2d 385, 400-01 (Tex. Crim. App. 1999); *Port v. State*, 791 S.W.2d 103, 105-06 (Tex. Crim. App. 1990); *Perillo v. State*, 758 S.W.2d 567, 575 (Tex. Crim. App. 1988).

Analysis

We construe the State's arguments on appeal as a challenge to the trial court's decision to suppress the statements from the initial and the second interrogation, to the trial court's conclusion that the physical evidence is "tainted," to the trial court's conclusion that the statements in the second interrogation are "tainted" by the refusal to terminate the initial interrogation, and to the trial court's conclusion that there was insufficient attenuation between the two interviews. The State also argues the trial

26

court erred in concluding that the statements were not made under "voluntary conditions due to law enforcement's failure to scrupulously honor the Appellee's unambiguous request to discontinue the interrogation[.]"

Simmons argued in the trial court and argues now on appeal that his statements on August 15th must be suppressed because the State failed to terminate the interview when he unambiguously invoked his right to terminate the interview and to remain silent. Simmons also asserts that when he said "6 all I got to say" he invoked his Sixth Amendment right to counsel, and "[l]aw enforcement's unrelenting questioning in the face of Appellee's reduced state due to intoxication on drugs and the duration of the interrogation amounted to coercion [and] any evidence obtained as a result of the Constitutional violation is fruit of the poisonous tree." Simmons also contends that because the statements made in the second interrogation on August 16th were obtained as part of the same continuation of the initial interview, the entire second interview must also be suppressed because it is "tainted" by the failure of the police to adhere to the requests to terminate that Simmons made in the initial interview. And Simmons argues that the State failed to show attenuation between the initial interview on August 15th and the second interview on August 16th. There is no contention from Simmons that the warnings that were given by the police failed to comply with *Miranda* or article 38.22.

27

The interrogation conducted on August 15th and the interrogation on August 16th were both recorded by video and the recordings were marked and admitted into evidence at the hearing. Simmons does not challenge the accuracy of the recordings. Simmons agrees he received his *Miranda* and article 38.22 warnings before the initial interrogation on August 15th, and that he received his warnings again at the beginning of the second interrogation on August 16th. The record reflects that before questioning Simmons on August 15th, Officer Cooke read the warnings to Simmons. Cleveland Police Officers Cooke and Shaver conducted the questioning of Simmons during the two-hour interrogation on August 15th, and Chief Broussard also asked Simmons some questions in the hallway on August 15th when Simmons was walking back to his jail cell.

The second interrogation began around 1:00 a.m. on August 16th. Near the beginning of the video recording of the second interrogation, Chief Broussard reads Simmons his *Miranda* rights and article 38.22 warnings again, and Simmons orally acknowledges that he understands his rights.

The trial court found that Simmons repeatedly invoked his right to terminate the initial interrogation by making the statements enumerated in the trial court's findings. The trial court found that Simmons's requests to terminate the interrogation were not ambiguous, that the officers did not immediately discontinue their

28

questioning of Simmons after these comments, that Simmons in response to continued questioning disclosed the location of Latasha's body, and that Simmons's statements "were not made under voluntar[]y conditions due to law enforcement's failure to scrupulously honor the Defendant's unambiguous request to discontinue the interrogation."[2]

An interrogating officer need not stop his questioning unless the suspect's invocation of rights is unambiguous. *Ramos*, 245 S.W.3d at 418; *Dowthitt*, 931 S.W.2d at 257. A police officer does not violate a suspect's right to remain silent

---

[2] Each of these findings references the initial interrogation. After reviewing the record, we conclude that during the second interrogation Simmons never uses any language that can be construed as an invocation of his rights. As to the initial interrogation, Simmons argues on appeal that when he said "6 all I got to say" he invoked his Sixth Amendment right to counsel during the initial interrogation. We disagree because the context in which the statement was made shows no more than an ambiguous reference to the number six. *See Davis v. United States*, 512 U.S. 452, 459 (1994) (to invoke the right to counsel a suspect "must unambiguously request counsel[]" and an officer need not cease questioning if a suspect's reference to an attorney is ambiguous or equivocal in that a reasonable officer given the circumstances would have understood only that the suspect *might* be invoking the right to counsel); *Dinkins v. State*, 894 S.W.2d 330, 351-52 (Tex. Crim. App. 1995) (noting that merely mentioning the word "attorney" or "lawyer" without more does not automatically invoke the right to counsel, and while there are no "magical words" required to invoke an accused's right to counsel, a suspect must at least express a definite desire to speak to someone and that the person be an attorney); *Mbugua v. State*, 312 S.W.3d 657, 665 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (defendant's question, "Can I wait until my lawyer gets here," was not a clear and unambiguous invocation to the right to counsel).

when he attempts to clarify whether the suspect wishes to remain silent, and then the suspect chooses to keep talking. *Hopkins v. Cockrell*, 325 F.3d 579, 583 (5th Cir. 2003); *Barnes v. Johnson*, 160 F.3d 218, 224-25 (5th Cir. 1998) (officer did not violate defendant's right to silence when he attempted to clarify whether defendant wished to invoke right with "a few explanatory, noncoercive questions," and defendant chose to keep talking).

When determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson*, 762 S.W.2d at 597. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *See Williams v. State*, 257 S.W.3d 426, 433 (Tex. App.—Austin 2008, pet. ref'd) (citing *Dowthitt*, 931 S.W.2d at 257 (suspect's statement, "I can't say more than that. I need to rest[]" was ambiguous and suggested only that suspect believed that he was physically unable to continue); and *Franks v. State*, 90 S.W.3d 771, 787 (Tex. App.—Fort Worth 2002, pet. ref'd untimely filed) (suspect's statement that he was tired and did not want to talk anymore was ambiguous and merely suggested the suspect was physically unable to continue)). The existence of a disability, such as intoxication, does not mean a statement given by a defendant is necessarily involuntary. *See Oursbourn v. State*, 259 S.W.3d 159, 173 (Tex. Crim. App. 2008); *Paolilla v. State*, 342 S.W.3d 783,

30

792 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). "When the record reflects evidence of narcotics, medications, or other mind-altering agents, the question becomes whether those intoxicants prevented the defendant from making an informed and independent decision to waive [his] rights." *Paolilla*, 342 S.W.3d at 792 (citing *Jones v. State*, 944 S.W.2d 642, 651 (Tex. Crim. App. 1996)).

Affording almost total deference to the trial judge's determination of historical facts as we must when those determinations are based on assessments of credibility and demeanor, we cannot say that the trial court clearly abused its discretion in finding that Simmons made unambiguous requests to terminate the initial interrogation. *See Guzman v. State*, 955 S.W.3d 85, 89 (Tex. Crim. App. 1997) (whether request to terminate interview was ambiguous is a mixed question of law and fact whose resolution turns on credibility and demeanor). The trial court could have disbelieved the testimony of the Cleveland officers that they thought the requests made by Simmons in the initial interrogation were ambiguous. *See Miranda*, 384 U.S. at 473-74; *Ramos*, 245 S.W.3d at 418-19 (defendant's statement that he "did not want to talk to [the detective]" during interrogation was "unambiguous, unequivocal, and unqualified assertion of his right to remain silent[]"); *Mayberry v. State*, No. 04-12-00704-CR, 2013 Tex. App. LEXIS 15166, at **3-8 (Tex. App.—San Antonio Dec. 18, 2013, no pet.) (mem. op., not designated

for publication) (defendant's statement during interrogation that "[he didn't] want to talk about this no more[]" was an unambiguous invocation of right to remain silent that required police to scrupulously honor it).

Next, we must determine whether the trial court erred in finding that the police failed to "scrupulously honor" the right to terminate the initial interrogation. *See Mosley*, 423 U.S. at 104 (admissibility of statements obtained after suspect invokes right to remain silent depends under *Miranda* on whether suspect's right to cut off questioning was "scrupulously honored[]"). The invocation of one's right to remain silent does not create "a *per se* proscription of indefinite duration" against further questioning. *Id*. at 102-03. Rather, as we previously stated, whether the resumption of questioning is consistent with scrupulously honoring the invocation of the right to remain silent depends on the unique circumstances of each case and includes the following factors: (1) whether the suspect was informed of his right to remain silent before the initial questioning; (2) whether the suspect was informed of his right to remain silent before the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether the subsequent questioning focused on a different crime; and (5) whether police scrupulously honored the suspect's initial invocation of the right to remain silent. *See Maestas*, 987 S.W.2d at 62 (citing *Mosley*, 423 U.S. at 103-05).

32

The trial court heard the testimony from the witnesses at the hearing and it viewed video clips from the video of the initial interrogation during the cross-examination of the witnesses. When Chief Broussard spoke to Simmons in the corridor about the whereabouts of Latasha Green, a missing person, Simmons had received his *Miranda* and 38.22 warnings, and the other two officers had just finished interrogating Simmons and were returning Simmons to his cell. The Chief did not repeat the warnings before he spoke to Simmons in the corridor. A very short period had elapsed between when the interrogating officers had terminated their questioning and when the Chief spoke to him in the corridor. The Chief asked Simmons to "help himself" by telling the police where to look for Latasha.

Applying the factors as outlined in *Mosley* to the uncontroverted facts, the trial court could have reasonably concluded that the police did not honor the suspect's invocation of the right to terminate the initial interrogation because the Chief continued to ask further questions of Simmons in the corridor after Simmons told the officers he wanted to terminate the interrogation. *See id*. at 62 (citing *Mosley*, 423 U.S. at 103-05). We cannot say it was an abuse of discretion for the trial court to conclude that the officers failed to scrupulously honor Simmons's requests to terminate the initial interrogation prior to the time Simmons made his statement to the Chief in the corridor telling the officers to look for Latasha on Wells Cemetery

Road. *See Ramos*, 245 S.W.3d at 418 (citing *Mosley*, 423 U.S. at 104-05).[3] That said, the State argues that the statement is still admissible because the statement Simmons made to the Chief in the corridor telling the officers to look on Wells Cemetery Road fits within the exception codified in article 38.22, section 3(c).

Before we examine the application of article 38.22, section 3(c), we address Simmons's argument that the trial court's order should be affirmed because the trial court concluded that "Defendant's statements were not made under voluntar[]y conditions due to law enforcement's failure to scrupulously honor the Defendant's unambiguous request to discontinue the interrogation." Simmons contends that if Simmons's statements were not *voluntary*, then article 38.22 (and therefore the exception in section 3(c)) would not apply. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6; *Oursbourn*, 259 S.W.3d at 171 (article 38.22, section 6 provides that only "voluntary" statements may be admitted).

A statement may be deemed "involuntary" under three different theories: (1) failure to comply with Code of Criminal Procedure article 38.22; (2) failure to comply with the dictates of *Miranda*; or (3) it was taken in violation of due process

---

[3] To the extent that the trial court's ruling granting the suppression of the statements was based on the trial court's finding that Simmons made "an unambiguous invocation" of the right to counsel, we conclude that finding is unsupported by the record. *See Davis*, 512 U.S. at 459.

or due course of law because the statement was not freely given due to coercion, incompetence, or improper influence. *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996); *Moore v. State*, 233 S.W.3d 32, 44 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *Miller v. State*, 196 S.W.3d 256, 266 (Tex. App.—Fort Worth 2006, pet. ref'd) (per curiam) (mem. op.). Simmons expressly concedes that he duly received his *Miranda* and statutory warnings before he made his statements, and his challenge depends on his argument that his right to terminate was not *scrupulously honored* which he contends was a constitutional violation. Therefore, we construe his challenge as an alleged due process violation. For the trial court to have found that his statements were not made under voluntary conditions, the record must reasonably support the conclusion that his statements were not freely given due to coercion, incompetence, or improper influence. *See Wolfe*, 917 S.W.2d at 282.

To determine the voluntariness of Simmons's statements, we examine the totality of the surrounding circumstances. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *Creager v. State*, 952 S.W.2d 852, 855 (Tex. Crim. App. 1997). A confession is involuntary if circumstances show that the defendant's will was "overborne[]" by police coercion. *Creager*, 952 S.W.2d at 856. In other words, a statement is involuntary if the record reflects "official, coercive conduct of such a nature" that any statement obtained thereby is "unlikely to have been the product of

35

an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).

The trial court found that Simmons invoked his right to terminate, but nothing in the record suggests that Simmons was subjected to the type of coercive police activity that could render his statements involuntary under the due process clause. *See Estrada v. State*, 313 S.W.3d 274, 297 (Tex. Crim. App. 2010) (holding interrogation techniques employed, which were much more intense than those in this case, were "not the type of brutal 'third-degree' techniques" that would render the confession involuntary under the Due Process Clause). Thus, the trial court's ruling cannot be affirmed on a due process challenge to the voluntariness of the statement.

Next, we determine whether the exception in section 3(c) applies to the statement given by Simmons in the corridor. The State contends that despite the officers' failure to scrupulously honor Simmons's requests to terminate the initial interrogation, the statement Simmons made in the corridor telling the Chief to look on Wells Cemetery Road is admissible under the exception in article 38.22, section 3(c). We disagree. We believe that while section 3(c) is an exception to the requirements in section 3(a), the exception does not nullify the obligation of the police to scrupulously honor an invocation of the right to terminate a custodial interrogation as recognized in *Mosley*. *See generally Hutchison v. State*, 424 S.W.3d

36

164, 179-82 (Tex. App.—Texarkana 2014, no pet.) (section 3(c) is an exception to "prohibition of oral nonrecorded statements contained in Section 3(a)" but not an exception to the *Miranda* warnings in section 2(a)). So we conclude the trial court did not err in suppressing the statement Simmons made in the corridor telling the police to look on Wells Cemetery Road.

### *Tucker/Elstad/Baker*

The State also argues that even if the State failed to scrupulously honor the defendant's requests to terminate the initial interrogation, the trial court erred in excluding the body and the shovel, all the physical evidence, and the second interrogation. The trial court concluded that all such evidence was "tainted" by the failure of the police "to scrupulously honor the Defendant's requests to terminate the interrogation." We find that the trial court incorrectly applied the applicable law.

It is well settled that the *Wong Sun* "fruit of the poisonous tree" doctrine does not apply to mere violations of the prophylactic requirements in *Miranda. Baker v. State*, 956 S.W.2d 19, 22 (Tex. Crim. App. 1997) (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). Thus, "while the statement taken in violation of *Miranda* must be suppressed, other evidence subsequently obtained as a result of that statement (i.e. the "fruits" of the statement) need not be suppressed." *Id.* (citing *Oregon v. Elstad*, 470 U.S. 298, 314 (1985); *Michigan v. Tucker*, 417 U.S. 433, 452 (1974)).

37

Both *Tucker* and *Elstad* involved a failure to give the required warnings rather than the failure to scrupulously honor warnings given. *See Elstad*, 470 U.S. at 300; *Tucker*, 417 U.S. at 435. In *Baker*, the Texas Court of Criminal Appeals applied the *Tucker*/*Elstad* rule to the fruits of statements made in the context of a failure to scrupulously honor the warnings that were given. *See Baker*, 956 S.W.2d at 22. The failure to adhere to the warnings that were provided, like the "mere noncompliance with *Miranda* does not result in a carryover taint beyond the statement itself. The failure to scrupulously honor a suspect's invocation of his right to remain silent by continuing questioning is not necessarily coercive." *Id.* at 23. "[T]he *Miranda* requirements embody an exclusionary rule or remedy rather than a substantive right or entitlement. Statements taken in violation of *Miranda* are not obtained in violation of the law; they are simply statements that are subject to a judicially imposed prophylactic rule of exclusion[.]" *Id.* at 24.

The *Tucker*/*Elstad* rule applies to the failure to scrupulously honor the invocation of *Miranda* rights. In the absence of actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the "fruits" doctrine. *Baker*, 956 S.W.2d at 23. The failure to scrupulously honor a suspect's invocation of his right to terminate a custodial interrogation by continuing questioning is not, by itself, coercive. *Baker*, 956 S.W.2d at 23. In finding an absence

of coercion in *Tucker,* the Supreme Court noted that no legal sanctions, such as perjury or contempt, attached to a refusal to answer questions. 417 U.S. at 445. Moreover, the case was unlike classical examples of coercion, which ranged from torture, to prolonged isolation from family or friends in a hostile setting, to a seemingly endless interrogation designed to exhaust the accused. *Id.* at 448-49.

> Likewise, continuing questioning after an accused's invocation of his right to silence does not, by itself, involve torture, isolation from family and friends, endless interrogation, the attachment of legal sanctions to the refusal to answer questions, or any other coercive activities. One federal circuit has expressly applied the *Tucker/Elstad* rule to the failure to scrupulously honor a suspect's invocation of his *Miranda* right to counsel. *Krimmel v. Hopkins,* 44 F.3d 704, 708-709 (8th Cir.), *vacated on other grounds,* 56 F.3d 873 (1995). We hold that the *Tucker/Elstad* rule applies to the failure to scrupulously honor the invocation of *Miranda* rights. In the absence of actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the "fruits" doctrine of *Wong Sun*.

*Baker*, 956 S.W.2d at 23. We believe the same rationale applies here.[4] *See id*.

Without any actual coercion, the fruits of a statement taken in violation of *Miranda* need not be suppressed under the fruit-of-the-poisonous-tree doctrine. *United States v. Patane*, 542 U.S. 630, 639, 641-42, 644 (2004) (The police do not violate the Fifth Amendment or *Miranda* by negligent or even deliberate failures to

---

[4] Simmons did not claim in the trial court, nor does he contend on appeal, that there was "actual coercion," or that he was tortured. He argues that the failure to terminate the questioning along with his intoxication made the questioning "coercive."

provide a suspect with *Miranda* warnings, and potential violations only occur upon admission of such statements into evidence at trial. At that point, the exclusion of the statement is a complete and sufficient remedy and suppression of physical fruits of suspect's statement is not required.); *Baker*, 956 S.W.2d at 22 ("The 'fruit of the poisonous tree' doctrine espoused in *Wong Sun* does not apply to mere violations of the prophylactic requirements in *Miranda*: while a statement taken in violation of *Miranda* must be suppressed, other evidence subsequently obtained as a result of that statement (i.e. the 'fruits' of the statement) need not be suppressed.").

There is no evidence in the record of actual coercion, and no evidence of police overreaching. We conclude that the physical evidence obtained as a result of Simmons's statement in the corridor, *i.e.*, the body and shovel, and other physical evidence, should be admissible. *See Elstad*, 470 U.S. at 318; *Baker*, 956 S.W.2d at 22. And, the trial court erred in concluding otherwise at the pretrial suppression hearing.

The Fifth Amendment's Self-Incrimination Clause prohibits compelling a defendant to testify against himself at trial, but it is not implicated by the introduction of non-testimonial physical evidence at trial even when that evidence was recovered, obtained, or found as a result of such statements. *Patane*, 542 U.S. at 635-37. "More generally, the *Miranda* rule 'does not require that the statements [taken without

40

complying with the rule] and their fruits be discarded as inherently tainted.'" *Id.* at 639 (internal citations omitted).

The trial court erred in concluding that all the evidence obtained by law enforcement and having a direct nexus to the disclosure made by the Defendant during the interrogations, "together with any analysis thereof and opinions associated therewith," is inadmissible during the trial of this case. The trial court also erred in concluding that the evidence is barred by article 38.23 of the Code of Criminal Procedure. *Miranda* or article 38.22, not article 38.23, is the vehicle for excluding statements obtained in violation of the *Miranda* guidelines, and *Miranda* claims do not fall within the exclusionary rule in article 38.23. *Contreras v. State*, 312 S.W.3d 566, 583 (Tex. Crim. App. 2010).

Simmons states in his appellate brief that "the issue here is not whether the police read Simmons his rights and recorded the interrogation[.]" In other words, this case does not involve a failure to provide *Miranda* or article 38.22 warnings. Rather, according to Simmons, "[t]he violation here that caused the trial court to suppress was not a simple violation of 38.22 § (3)(a) and potential admission under 38.22 § (3)(c); it was a violation of Appellee's rights under the Texas and U.S. Constitutions as well as statutory rights." Simmons did not specify which Texas and U.S. Constitutional rights were violated but argues the "State cannot hide behind"

41

subsection (c) as a shield for the "Constitutional violation that the police committed upon Gerard Simmons in failing to scrupulously honor his rights and thereby coercing his confession." The State emphasizes that law enforcement complied with the law, law enforcement read Simmons his rights before the first interview and again before the second interview, and that Simmons waived those rights and made voluntary statements.

The failure of the police to comply with the requirements in article 38.22 does not mean that the statement was necessarily obtained as a result of any legal or constitutional violation. *Nonn v. State*, 117 S.W.3d 874, 880-81 (Tex. Crim. App. 2003) (citing *Davidson v. State*, 25 S.W.3d 183, 185-86 (Tex. Crim. App. 2000) (Article 38.22 is a procedural evidentiary rule.)). In *Contreras*, the Court of Criminal Appeals explained that

> *Miranda* or article 38.22, not article 38.23, is the vehicle for excluding statements obtained in violation of the *Miranda* guidelines. And because *Miranda* claims do not fall within the ambit of article 38.23, a defendant is not entitled to a jury instruction under that statute. Article 38.22, not article 38.23, is the appropriate vehicle for obtaining a jury instruction regarding a purported violation of *Miranda*, to the extent such a vehicle is available.

312 S.W.3d at 583; *see also Williams v. State*, No. 09-10-00219-CR, 2011 Tex. App. LEXIS 9800, 2011 WL 6229164, at *17 (Tex. App.—Beaumont Dec. 14, 2011, no pet.) (mem. op., not designated for publication).

42

In *Chavez v. Martinez*, 538 U.S. 760 (2003), Justice Thomas explained that the Fifth Amendment does not support the view that using compulsive questioning methods constitutes a violation of the Fifth Amendment. 538 U.S. at 766-67. (Thomas, J., plurality opinion) ("The text of the Self-Incrimination Clause [in the Fifth Amendment] simply cannot support the . . . view that the mere use of compulsive questioning, without more, violates the Constitution."). As explained by Justice Thomas, there is a distinction between the assertion of one's right against self-incrimination and a violation of the Fifth Amendment. *See id.* at 770. "[A] violation of the Constitutional [Fifth Amendment] *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Id.* Therefore, we reject the constitutional argument made by Simmons.

As to the second interrogation, the trial court found that the second interrogation was not sufficiently attenuated from the initial interrogation. Depending upon the particular facts, a subsequent interview may constitute a continuation of an earlier interview. *See Bible v. State*, 162 S.W.3d 234, 242 (Tex. Crim. App. 2005). Facts a court may consider in determining attenuation include: (1) the passage of time, (2) whether the interrogation was conducted by a different person, (3) whether the interrogation related to a different offense, and (4) whether the officer asked the defendant if he had received any earlier warnings, whether he

remembered those warnings, and whether he wished to waive or invoke them. *See id.* (citing *Jones v. State*, 119 S.W.3d 766, 773 n.13 (Tex. Crim. App. 2003)). Even if one statement is made under circumstances that preclude its use, it does not perpetually disable the confessor from making a usable confession after those circumstances have been removed. *See Griffin v. State*, 765 S.W.2d 422, 428 (Tex. Crim. App. 1989) (citing *United States v. Bayer*, 331 U.S. 532, 540-41 (1947)); *Villarreal v. State*, No. 09-14-00503-CR, 2016 Tex. App. LEXIS 1093, at **5-6 (Tex. App.—Beaumont Feb. 3, 2016, pet ref'd.) (mem. op., not designated for publication) (statement taken by officer in second interview was not tainted by prior statements given in violation of *Miranda*). When a person voluntarily makes an inculpatory statement under circumstances that render it inadmissible under *Miranda*, the dictates of *Miranda* and the goals of the Fifth Amendment are satisfied by barring the use of that statement. *Elstad*, 470 U.S. at 318. No further purpose is served by imputing "taint" to a subsequent statement obtained pursuant to a voluntary and knowing waiver of the person's *Miranda* rights. *Id.*; *Williams*, 257 S.W.3d at 435-36.

It is undisputed that there was a four-hour break between the first interrogation and the second interrogation of Simmons. Additionally, at the beginning of the second interrogation Simmons received the required warnings under *Miranda* and

article 38.22. There is no evidence on the videos or in the record indicating that Simmons ever invoked his right to terminate during the second interrogation. Simmons does not argue that he asked to terminate the second interrogation. The second interrogation was conducted by Chief Broussard and Sergeant Lasko from the Liberty County Sheriff's Office. In the second interrogation, Simmons confessed, "I killed Latasha Green," and he provided the details about how, where, and why he killed her, states why he dumped her body on Wells Cemetery Road, and what he did with her car and her cell phone after he killed her. Based on the totality of the circumstances, we conclude that the two interviews were sufficiently attenuated. *See Bible*, 162 S.W.3d at 242. No further purpose is served by imputing "taint" to the subsequent statement which was obtained pursuant to a voluntary and knowing waiver. The trial court erred in concluding otherwise.[5]

To summarize, we affirm the trial court's decision to suppress the initial interrogation and the statement Simmons gave to the Chief in the corridor telling the

---

[5] Additionally, even if the two interrogations had not been sufficiently attenuated, the trial court's ruling was overly broad because it also excluded "all physical evidence" obtained from the statements Simmons made in the second interrogation, and that would also be error for the same reasons as outlined above with respect to the body and shovel. *See United States v. Patane*, 542 U.S. 630, 635-37 (2004); *Baker v. State*, 956 S.W.2d 19, 23 (Tex. Crim. App. 1997). Our record is silent on whether the police later found other physical evidence (*i.e.* the automobile or the cell phone that Simmons described in his second interrogation).

officers to search on Wells Cemetery Road because the State failed to scrupulously honor his request to terminate the first interrogation. We reverse the trial court's decision to suppress the body, the shovel, and "all evidence obtained by law enforcement and having a direct nexus to the disclosure made by the Defendant during the course of the interrogations, together with any analysis thereof and opinions associated therewith," because the trial court failed to apply controlling law and incorrectly applied the "taint" doctrine to the body, the shovel, and the other evidence, and reverse the trial court's ruling suppressing the second interrogation because we conclude that it was sufficiently attenuated from the initial interrogation, and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; REVERSED AND REMANDED IN PART.

_____
LEANNE JOHNSON
Justice

Submitted on February 28, 2019
Opinion Delivered February 5, 2020
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.